William DIXON, Jane Schennum and Robert Eisele, Plaintiffs,

v.

LADISH CO.; Armco, Inc.; Victor F. Braun; John H. Ladish; Robert S. Omelina; Gilbert F. Backes; Ralph Startz; Robert Daykin; Otto Widera; Orrin F. Brunner; Loren K. Olson; Victor F. Braun Foundation; Herman W. Ladish Family Foundation; C.C. Gladson; James V. Braun; Roger J. Myers; and Victor F. Braun, John H. Ladish and Roger J. Myers as Executors of the Estate of Sally Braun Myers, Defendants.

Charles KADEMIAN, Plaintiff,

v.

LADISH COMPANY, et al., Defendants.

Stan JANES, Plaintiff,

v.

LADISH COMPANY, et al., Defendants.

Herb ENDE, Plaintiff,

v.

LADISH COMPANY, et al., Defendants.

M.J. DEUTSCH, Plaintiff,

v.

LADISH COMPANY, et al., Defendants.

J.M. BROWNING, Plaintiff,

v.

LADISH COMPANY, et al., Defendants.

Civ. A. Nos. 81–C–1563, 82–C–722 to 82–C–726.

United States District Court, E.D. Wisconsin.

May 22, 1984.

considerably more than that.

22

Herbert Beigel, Barnett & Beigel, Stephen M. Merrick, Fishman, Merrick, Perlman & Nagelberg, Chicago, Ill., for plaintiffs.

Frank Daily, Quarles & Brady, Milwaukee, Wis., for defendant Ladish.

Richard Ninneman, Whyte & Hirschboeck, S.C., Milwaukee, Wis., for defendant Armco.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

This securities action, arising out of the 1981 merger between the defendant companies, Ladish and Armco, is before me on the defendants' motions to dismiss the complaint or, alternatively, for summary judgment. This decision pertains to separate actions which I consolidated for purposes of discovery and pretrial proceedings on November 8, 1982. The motions have been extensively briefed and supplemented with many affidavits and documents surrounding the merger. For this reason, I will treat the defendants' motions as motions for summary judgment.

In addition to an amended complaint which was filed on December 30, 1981, the plaintiffs have moved to add another claim to their five-count complaint. On September 7, 1983, the plaintiffs moved, pursuant to Rule 15(a), F.R.C.P., to add a new count, Count VI, alleging a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The defendants have requested that I first decide the motion to dismiss and then permit briefing and argument on the Rule 15 motion. I will do so.

Based on my review of the submissions of the parties in this case, I do not believe that the plaintiffs' federal claims fall within the purview of the securities laws. Accordingly, I believe that it is proper to grant the defendants summary judgment on these claims. I have decided to keep under advisement the motions to dismiss the state law-related breach of fiduciary duty claims and will decide them upon the completion of briefing on the Rule 15 motion.

## INTRODUCTION

The gist of the plaintiffs' complaint is that they were shortchanged as a result of the merger. They received less than they might have for their stock because those who conducted the merger were concerned about tax advantages and corporate control, not maximizing the cash return. Further, the defendants covered up their motives by issuing deceptive financial information about Ladish and the stock, by manipulating the market for Ladish stock, and by excluding potential competitors from the merger arena. In the end, the plaintiffs complain, all shareholders were forced to sell their Ladish shares to Armco at a value far below what might have been obtained elsewhere in the market.

 The following analysis begins and ends in federal law territory. Thus, what should be clear from the outset is the limited purpose of the federal securities laws. They were not created to recompense shareholders who claim merely that they have received inadequate consideration for the shares which they have traded in a merger. *See Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977), *cert. den.,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Browning Debenture Holders Committee v. DASA Corp.,* 560 F.2d 1078 (2d Cir. 1977). It is also fundamental that the securities laws do not penalize traders merely for failing or refusing to confess their "true" motives or characterize the fairness of the transaction. *See Panter v. Marshall Field & Co.,* 646 F.2d 271, 291 (7th Cir.), *cert. den.,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Indeed, the securities laws do not address any injuries which can fairly be said to result from corporate mismanagement rather than transactional fraud. Those questions involve state law and deserve federal attention only as an ancillary matter. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

## FACTS

*The Background of the Merger*

Because I am granting the defendants' motion, I will accept as true the "facts" as presented by the plaintiffs. Those facts present the following picture. The plaintiffs each owned shares of Ladish stock which were converted to shares of Armco stock as a result of the merger. The defendants, in addition to Ladish and Armco,

include former officers, directors, and shareholders of Ladish. The background of this case involves events which took place long before the 1981 merger ever came to fruition.

The plaintiffs describe the financial history of the Ladish Company as a conspiracy to maintain rigid control over the value of the company and to make it appear to be much lower than it actually was. Victor Braun was Chairman of the Ladish Board. Its chief officer was John Ladish. Their primary goal, in the plaintiffs' view, was to block any free market activity in Ladish securities, "to keep the reported value and trading prices of the Ladish Co. stock as low as possible". (Complaint, ¶ 31.) The underlying purposes in doing so were twofold: First, since much of the Ladish stock was held by charitable foundations which were run by Braun and Ladish, Braun and Ladish could maintain control of the company only if these foundations could avoid disposing of their stockholdings pursuant to IRS requirements for tax exempt foundations. By keeping the price of the stock low, the charitable foundations were able to maintain substantial holdings of Ladish stock, and Braun and Ladish were able to maintain control of the company. Second, keeping the stock price low enabled Braun, who had reached the age of 85 and who owned a substantial amount of Ladish stock, to pass on an estate whose value for tax purposes was significantly less than "its true worth" (Complaint, ¶ 31d).

In pursuit of these goals, the plaintiffs allege that Braun intervened in and controlled transactions of the stock by arranging sales at preset prices and by regulating the number of buyers and sellers in the market. (Complaint, ¶ 33a.) Braun also allegedly took steps to discourage transactions at the corporate level by restricting access to the company's financial information and by concealing or quashing bids for the company's control.

All of this alleged control over the market for Ladish shares began to come to an end when certain Ladish vice-presidents sought out a merger partner for Ladish.

They hoped to earn a rate of return better than what Braun made available, a deal which might reflect what they believed to be Ladish's true worth. However, they were unable to escape the force of Braun's control. For example, some officers approached Armco, who had long been a supplier and purchaser for Ladish, and who had allegedly coveted Ladish for years (Br. in Opposition at 15). However, Armco was concerned about offending Braun and losing Braun's cooperation in securing control of Ladish at some later date. Thus, according to the plaintiffs, Armco refused to purchase any shares without Braun's approval.

In late 1980, Ladish Vice-President Charles Kademian turned the attention of these maverick officers to ACF Industries, a Ladish customer which had expressed interest in pursuing a merger. Braun, however, attempted to dissuade ACF. He misrepresented the terms of ACF's proposal to the Ladish Board, he informed the ACF Chairman that any purchase of Ladish stock would be considered an unfriendly act, and he attempted to dissuade the mavericks from seeking offers for their stock.

However, ACF was undeterred. On June 13, 1981, it agreed to purchase stock from a group of vice-presidents. It acquired approximately 5% of outstanding Ladish stock at a cost of up to $2,000 per share—nearly 20 times the price which Braun had "predetermined" for sales of Ladish stock.

Through these purchases, ACF obtained a portion of shares sufficient under Wisconsin law to demand access to Ladish financial records. It was at this point, according to the plaintiffs, that Braun gave up hopes of controlling the company and began to pursue merger negotiations with Armco "regardless of the cost to Ladish shareholders" (Br. in Opposition at 17).

And so, according to the plaintiffs, a race to settle the merger ensued. It was in Braun's interests to declare a quick merger with Armco, the plaintiffs believe, in order to short-circuit a complete unraveling of the details of his prior stock manipulations and still maintain control over Ladish. It

was in Armco's interests to settle the merger as quickly as possible in order to preempt a bidding war with ACF.

Within a week after ACF's 5% purchase, Braun contacted Armco representatives. He met with them several times immediately after. At these meetings, Braun negotiated with Armco on the basis of studies prepared for him by the Ladish treasurer. These studies indicated that the company's true per share value was much higher than the $2,000 offer which ACF had proposed as its purchase price. Among the valuations which Braun defended were $3,468 per share, $3,738 per share, and $4,074 per share. Braun once calculated that when the company's "good will" was factored into valuations, the true worth of Ladish was $700 million—in excess of $6,000 per share. However, the deal settled much closer to the ACF offer. Armco proposed to exchange 60 Armco shares for 1 Ladish share, a value to Ladish shareholders of $2,100 per share. Armco's Chairman William Verity admitted at his deposition that the $2,000 mark was the "hurdle" Armco had to surpass.

Next the merging companies swiftly turned their attention to locking up their deal. According to the plaintiffs, this was necessary in order to head off a bidding war prompted by ACF. The Braun family, John Ladish and the two foundations together controlled nearly a majority of the outstanding shares of Ladish stock. Purchase agreements were executed with these and other shareholders on July 2, 1981. They consisted of conditional promises by Armco to purchase Ladish shares. Armco would buy the Ladish shares owned by those who signed the agreements if the merger failed to go through, but only on the condition that none of the contracted group commit itself to "vote any of the shares in favor of any merger or in favor of any sale of all or substantially all of the assets of the company with or to any company other than Armco" (Br. in Opposition, App.Ex. 11). Thus, regardless of the wishes of other directors or shareholders, Armco would have control of Ladish through this *fait accompli*.

Nevertheless, ACF continued to fight for control of the company. On July 15, 1981, ACF wrote the Ladish Board proposing a merger at $2,500 per Ladish share. At later points in time, ACF offered $3,000 and ultimately $3,200 per Ladish share. Armco made no effort to improve its offer in response, other than to increase the exchange ratio from 60 to 66 shares per Ladish share in order to account for the amount of value Armco stock lost while the deal was pending.

The Ladish Board approved the merger agreement on July 19, 1981. Ladish and Armco jointly issued a Proxy Statement on September 16, 1981, in anticipation of a shareholders meeting to be held on October 9, 1981. According to the plaintiffs, the defendants "carefully wove a tale of deception" into the Proxy. The plaintiffs claim that the Proxy Statement omits or misrepresents facts about Ladish finances, the corresponding value of its stock, Braun's manipulation of the stock, and the background of the merger negotiations.

On October 5, 1981, shortly before the shareholders convened to vote on the merger, the first of these consolidated cases was filed in the District Court for the Northern District of Illinois. District Judge John F. Grady permitted the shareholder meeting to proceed but enjoined the defendants from consummating the merger itself. This temporary restraining order was certified for interlocutory appeal, and an appeal was heard on October 15, 1981. The Court of Appeals vacated Judge Grady's order, ruling that the plaintiffs had made an inadequate showing of irreparable injury. The court also commented that:

In regard to likelihood of success on the merits ... a recent decision in *Panter v. Marshall-Field & Co.*, 646 F.2d 271 (7th Cir.1981), places very substantial obstacles in the way of plaintiffs' claims under the federal securities law which are based, as the claims in the instant case appear to be in this procedural context, on breaches of state law fiduciary duties

and the failure to disclose such breaches under the securities laws.

*Dixon v. Ladish Co.,* 672 F.2d 920 (7th Cir., 1981 at 5).

The shareholders met to vote on October 9. The merger was approved overwhelmingly. Approximately 92% of the shares were voted in favor of the merger. The only negative votes were cast by ACF, the plaintiffs Dixon and Schennum, the Steinbrecher family (approximately 1%) and shareholder Sutton (less than .1%).

An amended complaint was filed on December 30, 1981. The amended complaint, which is quite lengthy, alleges five counts against the defendants. Count 1 contains claims alleging violations of §§ 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j, 78n(e); and rules promulgated by the Securities and Exchange Commission. Count 2 alleges violations of §§ 11, 12(2), and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*, and 77q. Both Counts 1 and 2 are directed at all of the defendants. Count 3, which is directed at all of the defendants except for Armco, alleges a conspiracy to violate § 10(b) of the Exchange Act. Count 4, directed against all defendants, alleges a cause of action arising under Wisconsin state law for tortious interference with reasonable business expectancy. Count 5, which is directed against all the defendants with the exception of Armco, alleges a breach of fiduciary duty.

The specific conduct on which the plaintiffs base their claims may be synopsized under two headings: Facts relating to statements made in or omitted from the Proxy Statement; and facts relating to conduct outside of the Proxy which preceded and allegedly predetermined the merger.

*Facts Relating to the Proxy Statement*

The plaintiffs charge that the Proxy is rife with misrepresentations and omissions of fact which were critically important to shareholders weighing the merger proposal. Among the arguably actionable flaws they cite are:

(1). The plaintiffs insist that the financial health of the company was misrepresented by the Proxy. Fourteen pages of financial information was presented in a form which was certified by an independent accounting firm to conform with generally accepted accounting principles. Nevertheless, the plaintiffs contend that if certain information was accounted for and presented in a different fashion, Ladish would have appeared to be worth much more than the Proxy reported. For instance, had the Ladish inventory been calculated on a Last-In, First-Out (LIFO) basis, rather than a First-In, First-Out (FIFO) basis, reported earnings would have been higher. The Proxy *does* report this fact in a footnote. However, the plaintiffs insist that "no mention was made as to the practical impact" of this recalculation. The plaintiffs appear to demand that the Proxy should have done more than just note the effect of the recalculation on the inventory figure; it should have also presented reworked balance sheets illustrating the overall effect of the different methods on total earnings. Had it done so, it might have been more plainly stated that Ladish's pretax earnings would have appeared to be $60 million rather than the reported $21.3 million.

The same argument is made with respect to several other elements of the financial reports. The Proxy is attacked for understating total earnings by understating the rate of return on pension investments. The income Ladish earned by investing employee pension benefit funds was calculated on the basis of a 5% return on income rather than a higher rate. The plaintiffs argue that a higher rate was available to Ladish investors. The Proxy is allegedly misleading because it omitted information about the "practical effect" on earnings wrought by this fact.

Similarly, the Proxy understated overall worth because it understated the value of certain Ladish plant and equipment. These assets were valued at their cost to Ladish despite having market values far in excess of cost. Finally, overall earnings were misrepresented because Ladish accountants used certain accelerated depreciation and

amortization techniques which gave the appearance of expensing rather than capitalizing certain purchases.

(2). The Proxy omitted the results of internal valuation studies which confirmed Ladish's "true worth". The plaintiffs point out that Ladish negotiators themselves valued the company much higher than it was actually purchased for. It was fraudulent, the plaintiffs explain, for the Proxy to refer to two of the internal valuations prepared for Ladish negotiators (arriving at $3,468 and $3,738 figures) without revealing a third internal valuation which put the company's per share value at $4,074. Furthermore, the Proxy failed to describe the information and accounting methods underlying these valuations.

(3). The Proxy misrepresented the background of the merger proposals. Among details which the Proxy omits were the medieval details of Braun's earlier control over the market for Ladish shares and his attempts to quash bids for control of the company. It also omitted to state that it was Braun and not Armco who initiated merger discussions between Ladish and Armco. Nor does the Proxy reveal that Braun's offer came on the heels of the June 13 sale of 5% of Ladish stock to ACF—not 10 days later, as represented in the Proxy. Thus, the plaintiffs contend, the Proxy falsely implied that ACF was the unruly interloper who would have upset the lucrative Armco deal, rather than some other way around.

(4). The Proxy gave short shrift to a comparison between the features of an ACF merger and an Armco merger. The plaintiffs contend that it was deceptive to state that ACF was less compatible than Armco with Ladish without describing ACF's business. One line of ACF's business involved the oil area, which the plaintiffs claim was "a major and growing part

of Ladish's business". The Proxy did not present the detailed financial information about ACF that it gave about Armco.[1]

*Fraudulent Practices Outside the Proxy*

Other conduct which generated the merger amounted, according to the plaintiffs, to unlawful manipulation. The conduct itself as well as the defendants' failure to report it in the Proxy, are alleged to violate the securities laws.

The conduct on which the plaintiffs base these claims consists mainly of Braun's attempts to marshal control over the market for Ladish shares and the company itself. The plaintiffs assail Braun for blocking the development of a free market for Ladish stock. They allege that Braun maintained lists of prospective buyers and sellers of Ladish stock and arranged sales between them at preset prices. Furthermore, Braun enforced "handshake" agreements among Ladish officers to sell their stock back to Ladish. On top of all this, Braun restricted the flow of information concerning the value of Ladish stock, giving shareholders access only to bare summaries of selected financial records. The information which did trickle out was skewed, the plaintiffs charge, by the same accounting tactics described above.

As a result of all these actions, the market price of Ladish stock was kept at "predetermined" figures—$40–$50 per share prior to 1975, and $100–$125 per share after 1975. The plaintiffs allege that these prices had neither economic justification nor reflected supply or demand factors.

At the entity level, Braun undertook various actions to discourage corporate suitors. One step which he took was to conceal offers made by companies interested in purchasing Ladish. Braun allegedly concealed expressions of interest not only from Armco and ACF, but also from Gulf

---

**1.** Were it necessary, at a later point, to discuss the issue of reliance (I conclude below that it is not necessary to reach this issue; see n. 2, *infra*), several other facts would be worth recounting: Despite what has been asserted as a cleverly woven tale of deception, the plaintiffs have candidly stated in depositions that the

Proxy did *not* deceive them. *See, e.g.,* Dixon Dep. at 80–82. In fact, the plaintiffs voted against the merger. One of the plaintiffs testified that the most serious omission was the Proxy's failure to disclose the "true reasons" why Braun and other Ladish directors agreed to merge with Armco (*Id.* at 83).

& Western, United Technologies, and Aerojet.

The final element of alleged manipulative conduct consists of the "lock-up" agreements executed after the merger deal had been struck. The plaintiffs insist that the purchase agreements, which gave Armco control over Ladish no matter how the rest of the shareholders decided to vote, predetermined the outcome of the merger battle and constituted an unlawful *fait accompli.*

## DISCUSSION

The motion before me turns on whether the plaintiffs were prevented from making an intelligent investment decision when faced with the prospect of merger between Ladish and Armco. Having studied this question from the vantage points offered by the securities laws, I conclude that they were not.[2]

*The Purpose of the Securities Laws: Full Disclosure*

■ Undisputed stands the goal which the securities statutes were intended to meet and to which the courts limit their purview: full disclosure in securities transactions. In *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court wrote that "The Court repeatedly has described the 'fundamental purpose' of the [1934] Act as implementing a 'philosophy of full disclosure'; once full and fair disclosure has occurred the fairness of the terms of the transaction is at most a tangential concern of the statute." *Id.* at 477–478, 97 S.Ct. at 1302–03. The 1933 Act embraces the very same motivating and limiting philosophy. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). In deploying this "philosophy of full disclosure", it has been explained that

... the federal purpose is served if the [Proxy] statement fully and fairly sets out such relevant and material facts as would enable a reasonably prudent stockholder to make an intelligent decision as to whether to grant the requested Proxy or as to how he should vote on the questions mentioned in the Proxy statement. *Golub v. PPD Corp.,* 576 F.2d 759, 764 (8th Cir.1978). Thus, federal intervention is warranted only where the conduct alleged can be fairly viewed as misleading. Unless the defendants perpetrate some manipulation or deception which prevents shareholders from seeing clearly the elements of the proposed transaction, no federal interest is implicated. *Santa Fe* 430 U.S. at 473–474, 97 S.Ct. at 1300–01; *Bucher v. Shumway,* [1979–1980 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 97,142 at 96,299 (S.D.N.Y. 1979), *aff'd,* 622 F.2d 572 (2d Cir.), *cert. den.,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). Given the similarity of the purpose and operative language of the 1933 Securities Act, the same can be said for it.

■ Furthermore, in establishing federal supervision over the securities markets, Congress stopped short of authorizing federal scrutiny into matters of corporate management and fiduciary duty. Thus, the Court of Appeals for this Circuit has cautioned that if "the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law. To hold otherwise would be to eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship." *Panter* at 289 *quoting Hundahl v. United Benefit Life Insurance Co.,* 465 F.Supp. 1349, 1365–66 (N.D. Tex.1979). This means that a failure to disclose facts which would alert investors to nothing other than a breach of fiduciary duty is insufficient to invoke the federal remedy. The Court of Appeals for the Second Circuit underscored how substantial

---

**2.** The analysis which follows concentrates on the elemental issues (1) whether the defendants failed to disclose or represent differently any facts which federal law required; and (2) whether facts which they omitted or misrepresented were material to the Ladish shareholders. Because of the determination I reach on these issues, other issues raised by the parties, including the tricky issue of reliance (*See* n. 1, *supra*), need not be analyzed.

the nondisclosure must be when it cautioned that

> We are also not inclined to subject every tender offer to a knit-picking judicial scrutiny which will in the long run injure shareholders by preventing them from taking advantage of favorable offers. The disclosure required by the Act is not a right of confession or an exercise in common law pleading. What is required is the disclosure of material objective factual matters.

*Data Probe Acquisition Corp. v. DataTab, Inc.,* 722 F.2d 1, 4 (2d Cir.1983).

In this case, the plaintiffs' federal claims fall short of satisfying the purpose of the securities acts. What appears to be a rather bitter bout between opposing managerial camps cannot perdure in federal court on the basis of the nondisclosures, misrepresentations and manipulations which the plaintiffs describe. Indeed, intervening on the basis of what transpired in this case would set a precedent for federalizing every merger.

The plaintiffs' claims fail for several reasons. Some of the facts which they claim were not disclosed were. Some of the nondisclosures are not redressable under the securities laws in the first place. The rest of the non-disclosures involved facts which were not material to the reasonably prudent stockholders' decision. Most of the practices which they attack as manipulative were immaterial; those practices which did play a positive role in the merger—namely, the lock-up agreements—cannot fairly be called "manipulative" within the meaning of the securities acts. At bottom, the "central thrust" of the plaintiffs' complaint is better left to a state court to be adjudicated under principles of state corporation law: That the plaintiffs were in the end rooked out of a larger amount of cash by a majority group of shareholders, officers and directors who engineered and ratified a stock swap which was intentionally tax-free rather than cash-plenty implicates principles of fiduciary duty, not securities fraud.

Each instance of securities fraud which the plaintiffs allege is analyzed below:

*Self-Dealing*

■ The defendants' failure to describe, in terms as dramatic as those chosen by the plaintiffs, Braun and Ladish's interests in protecting the charitable foundations which they managed and in their control over the company does not state a claim under the securities laws. As was stated at the outset, the failure to reveal intent itself, no matter how impure, does not subject those who engineered the merger to securities fraud liability. *See Panter* at 289, 291. Like the claim in *Panter,* this allegation constitutes no more than a failure to reveal a breach of fiduciary duty.

The Ladish Board members did disclose the material facts underlying their own interests. The Proxy identifies the foundations which owned and voted Ladish stock (the Herman W. Ladish Family Foundation, Inc., which owned approximately 15% of Ladish and the Victor F. Braun Foundation, Inc., which owned approximately 3% of Ladish, and their directors, Victor Braun, John Ladish, Elwin Zarwell, and James V. Braun). Under "Reasons for the Merger", the Proxy identifies as the number one reason for approving the merger the fact that the merger afforded Ladish shareholders, "many of whom are long-term holders of low-basis Ladish Common Shares, the opportunity through a 'tax-free' exchange to participate in the ownership of an enterprise which is larger and more diversified and has greater resources than Ladish". *See* Proxy, Armco-Ladish Br. in Support, Ex. B at 3, 6–8, 13–14 (hereinafter "Proxy at ___"). Furthermore, the Proxy identifies the directors and officers of Ladish and demonstrates, by detailing how much of the company stock they controlled, the extent of their interest and voting power to perpetuate their offices. *Id.* at 6–8, 27. Cf. *Rodman v. Grant Foundation,* 608 F.2d 64, 73 (2d Cir.1979).

*Deceptive Accounting Methods*

■ The Proxy is attacked as deceptive because it omitted to state that the accounting methods employed by Ladish bookkeepers (generally accepted accounting principles, according to independent ac-

countants who reviewed the statements) understated Ladish's "true worth". In the first place, at least a portion of this information is made available in footnotes to the financials in the Proxy. *See, e.g.,* Proxy at 48 (FIFO/LIFO comparison).

Furthermore, the failure to rework the balance sheets using different accounting methods is not a duty which the securities laws impose. Faced with very similar facts, the *Hundahl* court also declined to require that this kind of data be provided:

> ... The claim is that there was not *enough* information given by Mutual to make the facts disclosed meaningful and, hence, not deceptive. But the omissions are not facts. They are, instead, non-disclosures of purpose and motive; for example, not disclosing that the true worth of the company stock was depressed by the accounting methods used.

*Id.* at 1364. *Hundahl* held "not cognizable under federal law" claims that Mutual failed to state that United's "very conservative" book value conversions understated United's worth and earnings and that Mutual failed to disclose that United's assets had appreciated to an amount substantially in excess of their book value. *Id.* at 1364–1365.

### Internal Valuation Studies

■ The Proxy reveals that Ladish negotiators to some degree believed that the company was worth more than shareholders actually realized in the exchange. It plainly states that two internal valuation studies were conducted, but only for use during merger negotiations. The studies put the value of the firm at $3,738 and $3,468 per share. The Proxy states that these figures were derived from "a list of items such as net worth of Ladish, market value of Oremet stock, the LIFO reserve, etc., which when added together produced 'adjusted book values'." Proxy at 13. The plaintiffs charge that the Proxy is deceptive because it fails to reveal a third study, which placed the value even higher, and because it failed to supply all the details underlying the stated conclusions.

Ladish's failure to reveal the details of valuation studies prepared for merger negotiations and not for public dissemination is not unlawful. The *Panter* court cautioned against the disclosure of tentative information which does not necessarily reflect reliable values:

> However, projections, estimates, and other information must be reasonably certain before management may release them to the public. Thus, in the recent case of *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221 (9th Cir.1980), the Ninth Circuit rejected the claim that defendants had a duty to disclose internal projections during the course of a tender offer for its own shares. The court held "[i]t is just good general business practice to make such projections for internal corporate use. There is no evidence, however, that the estimates were made with such reasonable certainty even to *allow* them to be disclosed to the public."

*Id.* at 292. As was discussed in *Panter,* the fact that these valuations varied greatly from valuations endorsed by independent accountants compels the inference that they were highly tentative and of little value outside the negotiations. *Id.* Other courts have declined to require that these kind of studies be published. "Ordinarily ... the courts discourage presentations of future earnings, appraised asset valuations and other hypothetical data in Proxy materials." *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir.1972), *cert. den.,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). "Full factual disclosure need not be embellished with speculative financial predictions." *Rodman* at 72.

### Stock Price and Supply Manipulation

■ Braun's alleged control over the market for Ladish stock—what plaintiffs have termed his "calculated market gamesmanship"—did not unlawfully determine the outcome of the merger. To successfully claim that Braun's conduct—his predetermination of Ladish stock prices and supervision over individual sales—constitutes illegal "manipulation" of the market, the plaintiffs must identify some "misleading"

effect it had on investors who were contemplating the merger. *Santa Fe* 430 U.S. at 476, 97 S.Ct. at 1302. As one court explained "manipulation",

> This term of art cannot be extended to cover every form of unfair dealing which appears to the lay person to be manipulative. The unifying element in a manipulative device as listed in *Santa Fe* is that they are "used to persuade the public that activity in a security is the reflection of genuine demand instead of a mirage."

*Billard v. Rockwell International Corp.*, 526 F.Supp. 218, 222 (S.D.N.Y.1981), *aff'd* 683 F.2d 51 (2d Cir.1982). Whether or not Braun was able to conjure a market mirage during some earlier period, it is plain that he did not have anyone transfixed during the pendency of the merger.

The plaintiffs paint a picture of controlled prices where the prices range from $50–125. Had the merger price fallen within this range, they might have had a claim. However, once ACF came on the scene, the market was blown wide open. ACF's initial offer was 20 times or more what the present range would lead one to believe Ladish stock was worth. No longer was Ladish stock being traded within "the market vacuum" (Br. in Opposition at 61) Braun allegedly created. ACF's purchase of 5% of the outstanding shares proved that no longer could Braun hold sway over individual sales of stock.

Nor can it be said that shareholders were misled from actively engaging in some bidding over the value of their stock. After all, Armco's proposal narrowly topped the $2,000 bid ACF made for the vice-president's stock. The Proxy also highlights the July 17, 1981, ACF offer of $2,500 per share for each outstanding Ladish common share (Proxy at 10), the August 3, 1981, ACF offer of $3,000 per share (Proxy at 12), and the August 26, 1981, ACF offer of $3,200 per share (Proxy at 13). Furthermore, the Proxy alluded to valuation studies which asserted an even higher per share value, which might have led shareholders to seek an even higher price for their holdings. In short, in the context of the merger, Braun's alleged control over the market could no longer be found to be misleading.

*Other Braun Machinations*

■ I do not believe that the total mix of information available to a reasonable shareholder would have been materially affected by explicit reference in the Proxy to any or all of the facts that: Braun had withheld from the Ladish Board previous expressions of interest; Braun and Ladish held a monopoly on detailed financial information pertaining to the performance of the Ladish Company between 1975 and 1980 and did not make this information available in great detail in annual financial reports; or that an ACF offer served as a prelude and as the mark to beat, not merely as interference, to the ultimately successful Armco offer. Because a materiality determination involves a mix of law and facts, these allegations must be carefully weighed. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). However, I do not believe that reasonable minds could differ on the question of materiality of the alleged omissions and misrepresentations under the circumstances of this case.

■ The legal test of materiality was defined by the Supreme Court in *TSC Industries:*

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132. This test applies to each provision of the securities acts upon which the plaintiffs rely. *See Greenapple v. Detroit Edison*, 468 F.Supp. 702, 708 (S.D.N.Y.1979), *aff'd.*, 618 F.2d 198 (2d Cir.1980) (§ 11, 1933 Act); *Alton Box Board Co. v. Goldman, Sachs & Co.*, 560 F.2d 916, 919–920 (8th Cir.1977) (§ 12(2), 1933 Act); *Spatz v. Borenstein,*

513 F.Supp. 571, 580 (N.D.Ill.1981) (§ 17(a), 1933 Act); *Berman v. Gerber Products*, 454 F.Supp. 1310, 1321–23 (W.D.Mich.1978) (§ 10(b) and 14(e), 1934 Act).

■ How would the total mix of information have been improved by a fuller or fairer explanation of the details above? What would the reasonable shareholder have learned? He might have learned more about the alleged corporate mismanagement of Ladish Company, but that quarrel does not bootstrap this case into federal court. He may have gained insight into Ladish's worth at some earlier juncture; however, the Proxy already offered accurate and plenary financial information about the company's *current* financial position, on which the merger proposal was based. Furthermore, the Proxy revealed that there was an interested party, namely ACF, who felt the company was worth even more.

The shareholder may have learned that the defendants were not giving ACF the full credit it deserved for shaking loose Braun's control over the price one could fetch for a Ladish share; although this fact may have rallied underdog sympathies to ACF and turned emotions against Braun, there is no reason to believe that the sentiments would have played a significant role in the investment decision itself. No matter who opened the bidding—Braun, Armco, ACF—the bids themselves were all plainly stated to the ownership. The numbers were all there; an "up close and personal" on the players would not have significantly altered the score on which those weighing the merits of the various offers decided.

Therefore, I do not believe that these omitted facts change the investment decision itself. The plaintiffs may have desired a different outcome to the merger battle, or may have desired that the opportunity be exploited to express shareholder resentment over Braun's control of the company; however, these are not purposes for which the securities laws were designed. None of the omitted facts directly underlying these desires were material to a prudent investment decision regarding the merger.

*ACF Financial Information*

■ I do not believe that the Proxy's failure to give a more detailed report of ACF's finances and a more detailed comparison between ACF and Armco materially affected the investment question posed to Ladish shareholders. ACF itself made this information available to each of the shareholders. It contacted them twice by letter and included a copy of ACF's Annual Report. See Ninneman Affidavit, Ex. E. Even had these steps not been taken, the information for which the plaintiffs clamor was publicly available (both ACF and Armco were publicly traded) to shareholders who would have considered it important. The parties cite no authority for their positions on this subject. However, it appears that no duty is imposed on the defendants to restate information which is publicized or widely known. *See Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 606 (5th Cir.), *cert. den.*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Ins. Co.*, 606 F.2d 602, 610 (5th Cir.1979), *cert. den.*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980); *Beissinger v. Rockwood Computer Corp.*, 529 F.Supp. 770, 781 (E.D.Pa.1981).

*The Purchase Agreements*

■ Nor do I believe that the Armco "lock-up" purchase agreements violate the federal securities laws. The Court of Appeals for the Second Circuit, in *Data Probe, supra*, recently declined to expand the concept of "manipulation" to include such lock-up practices:

> Viewing the CRC option solely as a self-serving barrier created by Data Tab's management to prevent its shareholders from choosing the Data Probe offer, the gravamen of the wrong alleged is a breach of fiduciary duty which we are not free to condemn under existing federal legislation.

*Id.* at 4, *citing Santa Fe, supra*. The key inquiry, the court had explained in a

previous case, *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757 (2d Cir.1983), was to determine whether the conduct which was alleged to be "manipulative" works in some way to *mislead* the shareholders. If the pernicious effect of the practice derives from something other than its potential for misleading, then the claims fall outside the federal securities acts, somewhere, perhaps, within the realm of state corporation law. In this case the purchase agreements may have operated unfairly, but they did not mislead anyone; they were fully explained in the Proxy. Therefore, their operation does not constitute "manipulative" conduct within the purview of the securities acts.

The plaintiffs' argument rests almost exclusively on the decision of the Court of Appeals for the Sixth Circuit in *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 (6th Cir.1981). *Mobil* declared that it was manipulative and illegal for U.S. Steel to preempt the tender offer bid of Mobil Oil by striking an alternative agreement with Marathon which provided that if U.S. Steel's bid for control of Marathon failed, it would be free to buy a portion of Marathon, a portion which just happened to constitute the core of the company's assets. Therefore, even if Mobil had gained control of Marathon, it would lose control of what made the Marathon deal so enticing in the first place. The *Mobil* court declared this *fait accompli* violative of the Williams Act.

The *Data Probe* court expressly questioned the *Mobil* decision, which stretches the mission of the securities laws beyond "full disclosure" into a realm of general fair conduct. Since I find the *Data Probe* analysis more compelling, I agree that the "lock-up" agreements in this case do not violate the securities acts.

## CONCLUSION

■ For all the foregoing reasons, I do not believe that the plaintiffs' complaints state claims on which I can grant relief under the federal securities laws. In such a position, I do not believe that there would be pendent jurisdiction over the other claims which plaintiffs make and which arise under state law. Under the rationale of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), I am inclined to dismiss these claims as well.

However, in the interim between the filing of the federal securities claims and this decision, the plaintiffs have filed a motion to amend their complaint to allege claims arising under RICO. The defendants have requested that they be given a chance to brief that motion before receiving a decision on it. If the defendants are unsuccessful in defeating the motion to amend the complaint, there may be grounds for exercising pendent jurisdiction. Accordingly, I believe that it is appropriate to keep the motions to dismiss Counts IV and V of the complaint under advisement until I am able to resolve the motion to amend the complaint. I hope to resolve this issue quickly, and the schedule announced will serve to meet that purpose.

Therefore, the following ORDERS are issued:

1. Counts I, II, and III of the Amended Complaints are hereby DISMISSED.

2. The defendants shall respond to the plaintiffs' motion to amend no later than two weeks from the date of this order.