803 F.2d 749
 Fed. Sec. L. Rep. P 92,953
Elfriede MAYER, Plaintiff-Appellant,
v.
OIL FIELD SYSTEMS CORP., Integrated Energy, Inc., and John
Doe fictitious, the true name or names being
presently unknown to the plaintiff,
Defendants- Appellees.
 No. 843, Docket 85-7949.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 21, 1986.
Decided Oct. 10, 1986.
 
 Jules Brody, New York City (Stull, Stull & Brody, New York City, on brief), for plaintiff-appellant.
 Franklin B. Velie, New York City (Janis G. White, Christy & Viener, New York City, on brief), for defendant-appellee Oil Field Systems Corp.
 Brian J. Gallagher, New York City (Kronish, Lieb, Weiner & Hellman, New York City, on brief), for defendant-appellee Integrated Energy, Inc.
 Before OAKES, KEARSE and PRATT, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 In this opinion, undoubtedly to be dubbed "Mayer V", we consider the appeal of plaintiff Elfriede Mayer from a final judgment of the United States District Court for the Southern District of New York, Robert W. Sweet, Judge, dismissing her complaint seeking damages from defendants Oil Field Systems Corp. ("OFS") and Integrated Energy, Inc. ("Integrated"), on account of their allegedly false and misleading statements and nondisclosures in a prospectus and other communications, in violation of Secs. 11 and 12(2) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. Secs. 77k and l(2) (1982); Sec. 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. Sec. 78j(b) (1982), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission (Sec. 10(b) and Rule 10b-5 hereinafter collectively referred to as "Sec. 10(b)"); and in violation of OFS's fiduciary duties under state law. In a prior appeal in this case, we reversed the district court's dismissal of Mayer's complaint for failure to state claims upon which relief can be granted under the federal securities laws, see Mayer v. Oil Field Systems Corp., [1982-1983] Fed. Sec. L. Rep. (CCH) p 99,048 (S.D.N.Y.1982) ("Mayer I" ), as we concluded that Mayer had standing and had stated a claim under Sec. 10(b). Mayer v. Oil Field Systems Corp., 721 F.2d 59 (2d Cir.1983) ("Mayer II" ). On remand, following discovery and crossmotions for summary judgment, the district court dismissed the complaint principally on the ground that the undisputed facts showed that Mayer was not deceived and had actual knowledge of each fact she alleged had been misrepresented or withheld. Mayer v. Oil Field Systems Corp., 611 F.Supp. 635 (S.D.N.Y.1985) ("Mayer III" ); see also Mayer v. Oil Field Systems Corp., 620 F.Supp. 76 (S.D.N.Y.1985) ("Mayer IV" ) (denying reconsideration).
 
 
 2
 On appeal now from the final judgment entered following Mayer III and Mayer IV, Mayer contends that the district court erred in failing to grant judgment in her favor on the federal securities law claims and in refusing to take pendent jurisdiction of her state law claims. Finding no merit in her contentions, we affirm the judgment of the district court.
 
 I. BACKGROUND
 
 3
 The events underlying this case have been amply set forth in Mayer III, 611 F.Supp. 635, familiarity with which is assumed. None of the following facts is in dispute.
 
 A. The Partnership Agreements
 
 4
 Mayer was a limited partner in two oil partnerships in which OFS was the general partner. The pertinent agreements provided that OFS was, subject to limitations not pertinent here, to have full and exclusive discretion in the management and control of the partnerships and that the limited partners would have no role in the management of the partnerships' affairs. Each partnership agreement established a time of "payout" or "first payout," defined in the agreements as "[t]he time at which Partnership Net Revenues distributed or distributable to the Limited Partners equals the aggregate amount contributed by the Limited Partners to the capital of the Partnership under their Subscription Agreements."
 
 B. The Exchange Offer
 
 5
 In March 1981, Integrated, an independent company formed in 1979 to acquire oil and gas properties, distributed a prospectus (the "Prospectus") in which it offered to exchange shares of its common stock for interests in oil and gas properties (the "Exchange Offer"). Bache Halsey Stuart Shields ("Bache") was to serve as dealer manager for the Exchange Offer. The first page of the Prospectus stated the procedure by which Integrated proposed to determine the number of shares to be exchanged for each interest tendered:
 
 
 6
 The number of shares of Common Stock issuable for tendered Interests will be determined by dividing the exchange values (the "Exchange Values") of such interests by $10, an arbitrary figure which has been established for the purpose of making the Exchange Offer. The Exchange Values of Interests tendered will be based upon available engineering estimates and other information.
 
 
 7
 The Prospectus detailed the risk factors present in the Exchange Offer, including the following:
 
 
 8
 Although no market currently exists for the shares of [Integrated's] Common Stock, management of [Integrated] believes that a market will develop. However, no assurance can be given that a market will develop or as to the prices at which the Common Stock will trade. The market value of the Common Stock may be significantly less than the Exchange Values of the Interests tendered to and accepted by [Integrated]....
 
 
 9
 ... Because of the diversity of Interests which may be tendered and the subjective nature of oil and gas reserve estimates, and because the determination of Exchange Values depends upon subjective judgments of [Integrated], there can be no assurance that the Exchange Values of all interests tendered to and accepted by [Integrated] will be consistent or that actual values of Interests acquired by [Integrated] will equal their Exchange Values. To the degree that such Exchange Values are not consistent, certain accepting Holders may benefit more from the Exchange Offer than others. See "Limitations on Determination of Exchange Values," below.
 
 
 10
 This section of the Prospectus also stated that "the ultimate value of any Interest tendered may be substantially more or less than the Exchange Value assigned to such Interest."
 
 
 11
 C. OFS'S Participation in the Exchange Offer
 
 
 12
 By letter dated May 7, 1981 (the "May 7 Letter"), OFS sent to Mayer and the other limited partners a copy of Integrated's Prospectus, together with copies of articles from The New York Times, Fortune magazine, and Legal Times of Washington about the Integrated Exchange Offer. The May 7 Letter stated in part as follows:
 
 
 13
 We have not determined whether to accept the Integrated proposal or not, but feel we should proceed with the [independent appraiser's] evaluation of your wells. Once the reservoir report is completed, we will make a decision based on the results....
 
 
 14
 ....
 
 
 15
 In the event we accept the exchange, it is our intention to distribute the shares to the partners. It goes almost without saying that we are moving from a reservoir and production risk to a price risk on the stock, for the period you hold the stock.
 
 
 16
 The market risk should be somewhat ameliorated by the fact that Bache is simultaneously underwriting Integrated's shares at $10 per share and would have strong incentive to protect the market. The conventional wisdom as set forth in the Fortune article is that the stocks initially go down while people who exchange liquidate their interest, and then zestily rebound.
 
 
 17
 (Emphasis in original.) The accompanying article from Fortune described a number of stocks whose prices had risen after such an exchange, and it referred prominently to the likelihood of the initial market price of the stock being low when "many former limited partners take advantage of the opportunity to cash in." However, it did not state that stock prices thereafter usually rise but said only that "if shares are priced too low, 'the market will recognize this and the stock will go up.' "
 
 
 18
 In August 1981, OFS agreed, following negotiations with Integrated and the receipt of an independent appraisal of the partnership properties, to have its partnerships participate in the Exchange Offer. Integrated issued a Prospectus Supplement dated September 11, 1981, listing the exchange values of the partnership interests tendered, including those of OFS. The Prospectus Supplement stated that "[t]he number of shares of Common Stock issuable for the Interests has been determined by dividing the Exchange Values of such Interests by $10.00, an arbitrary figure which has been established for the Purpose of making the Exchange Offer," and that
 
 
 19
 [t]he prices at which the Common Stock may trade following the consummation of the Exchange Offer may be significantly less than the $10 used to determine the number of shares issuable for Interests, and may bear no relationship to the Exchange Values or the fair market values of the tendered Interests.
 
 
 20
 The Prospectus Supplement also stated that Bache was acting as dealer manager for the Exchange Offer. The Prospectus required that partnerships that agreed to the exchange reconfirm their tenders prior to October 15, 1981; failure to reconfirm would constitute a withdrawal of the tender. OFS sent its reconfirmation letter on September 22. The Prospectus stated that Integrated intended to exchange its shares for the partnership interests as soon as practicable after October 15, but that partnerships could withdraw their reconfirmations at any time up to the actual exchange date.
 
 
 21
 OFS sent the limited partners a copy of Integrated's Prospectus Supplement on or about September 15. The covering letter stated that the partners as a group would be entitled to 99% of the Integrated shares until the program reached payout. By letter dated October 6, OFS informed the limited partners that the Exchange Offer had a projected closing date of October 15, 1981, and that the Integrated shares would thereafter be sent directly to each limited partner. The letter stated that "[f]or the purpose of both determining the number of shares to be issued by Integrated as well as determining when pay-out is reached the $10.00 exchange price has been applied." The letter sent to Mayer contained a handwritten indication of the precise number of shares Mayer would receive.
 
 
 22
 Integrated sent no communications to Mayer regarding OFS's use of the $10 figure to calculate payout, and OFS sent no further communications to the limited partners regarding the Exchange Offer. The actual closing of the Exchange Offer took place on November 10, 1981. The Integrated shares began trading on the American Stock Exchange on November 12, 1981, and opened at $4 7/8 per share.
 
 D. Mayer's Claims of Deception
 
 23
 As described by the district court, Mayer claims, on the basis of the above events, that defendants violated Secs. 11 and 12(2) of the 1933 Act and Sec. 10(b) of the 1934 Act, in that
 
 
 24
 1) OFS and Integrated failed to disclose that they valued the Integrated stock at $10/share knowing that the stock did not have this value;
 
 
 25
 2) OFS and Integrated failed to disclose that they valued Integrated stock at $10/share to permit an accelerated payout and the consequent misallocation of shares to the general partners;
 
 
 26
 3) OFS and Integrated failed to disclose that the $10 per share price, and not the market value, was used to compute when payout had been reached;
 
 
 27
 4) OFS made a materially false and misleading statement in correspondence to the limited partners when it said that [Bache] was underwriting the Exchange Offer; and
 
 
 28
 5) OFS made a false and misleading statement in correspondence to the limited partners when it stated that the shares' market value might drop initially but would then "zestily rebound."
 
 
 29
 Mayer III, 611 F.Supp. at 636-37.
 
 
 30
 Although OFS had complete control of the partnership affairs and the consent of the limited partners was not required for OFS to agree to the Exchange Offer, Mayer's contention was that had the material facts been fully and accurately disclosed, she could have brought an action in state court to prevent consummation of the exchange she believed to be unfair.
 
 E. Mayer's Inquiries and Her Knowledge
 
 31
 At her deposition following our remand in Mayer II, Mayer was questioned as to her contemporaneous familiarity with the pertinent transactions and events. Her testimony included the following.
 
 
 32
 Mayer had received and read the Prospectus. She had received and read the Prospectus Supplement. She had read that part of the Prospectus Supplement that stated that Bache was acting as dealer manager for the Exchange Offer, and she understood the difference between a dealer manager and an underwriter.
 
 
 33
 Mayer had read in the Prospectus Supplement the statement that the $10 figure used to determine the number of shares issued was "arbitrary." She had received the October 6 letter from OFS and understood that the $10 figure would be used to calculate payout.
 
 
 34
 After Mayer had received the October 6 letter from OFS, her son, who acted as her investment adviser, called OFS on October 12 to discuss the Exchange Offer. Mayer testified that her son was told that the shares "may open [at] 10, less or more, and that they had to pick a figure for the computation of the distribution of shares and they picked that figure," and that "it was ... all done already." She testified that she and her son did not like the fact that OFS "had picked this arbitrary figure [for determining when payout was reached] instead of, as we found to have been fair, waiting for the stock to have a marketable value, because at that point, $10 was not marketable value." However, Mayer and her son took no further action; they felt that "[t]here was nothing to be done at that point because the things had been done already."
 
 
 35
 F. The District Court's Decision in Mayer III
 
 
 36
 Upon the parties' cross-motions for summary judgment, the district court reviewed these undisputed facts and dismissed the complaint. It found that "by October 12, 1981, three days prior to the consummation of the transaction, Mayer had knowledge of each of the facts which the complaint alleges to have been concealed." Mayer III, 611 F.Supp. at 640. With respect to the misstatement in OFS's May 7 Letter that Bache was underwriting the Integrated shares and the prediction that the share price would "zestily rebound," the court found (a) that in light of the statements in the Prospectus and Prospectus Supplement and subsequent OFS letters, which Mayer acknowledged having read, Mayer knew that Bache was acting as dealer manager and that the $10 price was arbitrary and might bear no relationship to the ultimate value of the shares, and (b) that OFS' "zestily rebound" prediction was not made with an intent to defraud. See id. at 641. Finding no deception by defendants, and finding actual knowledge by Mayer of each of the facts alleged to have been withheld from the Prospectus and Prospectus Supplement, the court held that Mayer had no valid claim under either the 1933 Act or the 1934 Act. Id.
 
 
 37
 The court noted that OFS's use of the $10 figure to determine payout appeared to violate both the partnership agreements and OFS's fiduciary duty to the limited partners, but it declined to exercise pendent jurisdiction to decide these state law claims. Id.
 
 
 38
 Mayer moved for reconsideration, arguing that her knowledge of all the material facts on October 12 was irrelevant because the reconfirmation of tender by OFS on September 22 had eliminated any right she had to seek an injunction against consummation of the exchange. The court denied the motion, finding that Mayer's "state remedies did not become unavailable until the closing of the transaction which could not have occurred before the October 15 cutoff date for reconfirmations ... and did not actually occur until November 10, 1981." Mayer IV, 620 F.Supp. at 77.
 
 
 39
 Judgment was entered dismissing the complaint, and this appeal followed.
 
 II. DISCUSSION
 
 40
 On appeal, Mayer contends that the district court should have upheld her federal securities law claims, and that even if those claims were properly dismissible, it should have retained jurisdiction to decide her state law claims. Given the facts as to which there is no genuine dispute, we find no error in the dismissal of the complaint.
 
 
 41
 Preliminarily, we note our rejection of Mayer's suggestion that the district court's decision somehow disregarded our mandate in Mayer II. Mayer II merely reversed a ruling under Fed. R. Civ. P. 12(b)(6) that Mayer had failed to plead a claim upon which relief can be granted under the federal securities laws. We held that, within the meaning of Sec. 10(b), Mayer's interest in the partnerships was a security and that she was a purchaser with standing to sue, that the complaint adequately alleged the elements of a claim under that section, and that, accepting the allegations of the complaint as true (although, to a degree, we termed them "vague and perhaps inducing scepticism," Mayer II, 721 F.2d at 67), state law would have allowed Mayer to prevent consummation of OFS's exchange of the partnerships' shares had she known the truth in time. We did not purport to decide any matter of fact.
 
 A. The Statutory Provisions
 
 42
 Section 10(b) of the 1934 Act provides that:
 
 
 43
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 
 
 44
 ....
 
 
 45
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 46
 15 U.S.C. Sec. 78j(b). Rule 10b-5 provides that:
 
 
 47
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 48
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 49
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 50
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 51
 in connection with the purchase or sale of any security.
 
 
 52
 17 C.F.R. Sec. 240.10b-5 (1986).
 
 
 53
 Section 11 of the 1933 Act provides, in pertinent part, that:
 
 
 54
 (a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--
 
 
 55
 (1) every person who signed the registration statement;
 
 
 56
 (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
 
 
 57
 (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partners; ...
 
 
 58
 (5) every underwriter with respect to such security....
 
 
 59
 15 U.S.C. Sec. 77k. And Sec. 12(2) of the 1933 Act imposes civil liability on
 
 
 60
 [a]ny person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission....
 
 
 61
 15 U.S.C. Sec. 77l (2).
 
 B. The Alleged Nondisclosures
 
 62
 It is well settled that a private plaintiff may not recover under Sec. 10(b) unless the defendant misrepresented or omitted a material fact and the plaintiff had no knowledge of that fact. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 473-74, 97 S.Ct. 1292, 1300-01, 51 L.Ed.2d 480 (1977); Madison Consultants v. FDIC, 710 F.2d 57, 61 (2d Cir.1983); Ply-Gem Industries, Inc. v. Green, 503 F.2d 1362, 1365 (2d Cir.1974). Nor may he recover under Secs. 11 and 12(2) of the 1933 Act unless the defendant misrepresented or omitted a material fact and the plaintiff had no knowledge of the untruth or omission. See 15 U.S.C. Secs. 77k(a), 77l (2) (1982); Dixon v. Ladish Co., 597 F.Supp. 20, 28 (E.D. Wis.1984), aff'd in part, rev'd in part on other grounds, 792 F.2d 614, 621 & n. 6 (7th Cir.1986); Piemonte v. Chicago Board Options Exchange, Inc., 405 F.Supp. 711, 718 (S.D.N.Y.1975); Eichen v. E.F. Hutton & Co., 402 F. Supp. 823, 827 (S.D. Cal.1975).
 
 
 63
 These principles required the dismissal of three of Mayer's five claims, i.e., that defendants failed to disclose that the $10 per share figure (1) was arbitrary, (2) was not intended to reflect market value, and (3) was to be used to determine payout. The documents reveal clearly that these facts were disclosed to Mayer prior to the projected October 15, 1981 closing of the Exchange Offer and the actual November 10, 1981 closing. Mayer's deposition testimony plainly reveals that she had timely read the documents and understood them.
 
 
 64
 In an effort to parry the indisputable fact that she knew by October 12 all of the facts she claims were omitted or misrepresented, Mayer asks us to find that the deadline by which she would have had to seek a state court injunction against the exchange was not October 15, the deadline for reconfirmation of tenders, but September 22, the date on which OFS in fact reconfirmed its tenders. She argues that "[s]ince these Reconfirmations were irrevocable, the Exchange Offer was effectively completed on September 22, 1981." Mayer's characterization of the reconfirmation as irrevocable is unsupported by any citation to the record, and it appears to be unsupportable, for the Prospectus stated that "[a]ll reconfirmations of tenders of interests will be revocable at any time prior to the Exchange Date."
 
 
 65
 In sum, since no rational trier of fact could find the nondisclosure and lack of knowledge required to hold these defendants liable to Mayer, summary judgment dismissing these claims was proper. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., --- U.S. ----, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 C. The Misstatements by OFS
 
 66
 Mayer's remaining federal securities law claims, based on the two misstatements in OFS's May 7 Letter, were also, in light of the record, properly dismissed as a matter of law. These misrepresentations could not support a claim under Sec. 11 of the 1933 Act since they were not made in a registration statement. See 15 U.S.C. Sec. 77k(a). Her claims under Secs. 10(b) and 12(2) were dismissible for other reasons.
 
 
 67
 The claims based on OFS's misrepresentation as to the role of Bache were properly dismissed on the basis of the principles discussed in Part II.B. above. Defendants could not be held liable to Mayer under either Sec. 10(b) or Sec. 12(2) if Mayer had knowledge of the fact misrepresented. Here, the record shows that although the May 7 Letter incorrectly stated that Bache would serve as underwriter of the Integrated shares, the subsequent Prospectus Supplement correctly identified Bache as "Dealer Manager" for the Exchange Offer. Mayer testified to having read the Prospectus Supplement and to understanding that a dealer manager was only an "agent" whereas an underwriter "takes a certain responsibility in the stock he is promoting." Accordingly, Mayer's knowledge and understanding of Bache's true role required the dismissal of her Secs. 10(b) and 12(2) claims concerning the mischaracterization of Bache as an underwriter.
 
 
 68
 Mayer's claims based on the other misrepresentation in the May 7 Letter, i.e., the indication that according to the conventional wisdom the price of the Integrated shares would "zestily rebound" after an initial depressed opening, were dismissible on different grounds: The claims against OFS were dismissible for lack of any evidence of scienter, and the claims against Integrated were dismissible for lack of any evidence that Integrated had any role in making the misstatement.
 
 
 69
 It is well established that in order to prove a Sec. 10(b) claim, the plaintiff must prove the defendant's scienter. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Similarly, when, as is true here, the person who made the misrepresentation is not the immediate and direct seller of the securities, the imposition of liability on him under Sec. 12(2) as a participant, aider and abettor, or coconspirator also requires proof of scienter. See Lanza v. Drexel & Co., 479 F.2d 1277, 1298 (2d Cir.1973) (en banc) (Sec. 12(2) requires "privity or, in the absence of privity, scienter") (footnotes omitted); Klein v. Computer Devices, Inc., 602 F.Supp. 837, 841 (S.D.N.Y.1985); Hitchcock v. deBruyne, 377 F.Supp. 1403, 1405-06 (D. Conn.1974) (Newman, J.); L. Loss, Fundamentals of Securities Regulation 1184-85 (1983); see also Aid Auto Stores, Inc. v. Cannon, 525 F.2d 468, 470-71 (2d Cir.1975) (per curiam). Scienter requires at least knowing misconduct, which may, of course, be proven as a matter of inference from circumstantial evidence. See Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir.1984). Summary judgment is appropriate when the nonmoving party has come forward with no evidence from which a reasonable factfinder could find that the defendant had the requisite state of mind. See Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).
 
 
 70
 These principles warranted the summary dismissal of Mayer's Secs. 10(b) and 12(2) claims against OFS. The record contains no evidence indicating that OFS engaged in any intentional or knowing misconduct in suggesting that the price of Integrated shares would "rebound." Indeed, all of the indications are to the contrary. Thus, the May 7 Letter was accompanied by the Prospectus which emphasized the arbitrariness of the $10 figure and the potential uncertainties regarding the market's pricing of the Integrated shares. More importantly, the Fortune magazine article that OFS was expressly purporting to characterize also accompanied the May 7 Letter. Given Mayer's failure to come forward with any evidence from which scienter could be inferred, summary judgment in favor of OFS concerning the "zestily rebound" statement was appropriate.
 
 
 71
 Nor, on this record, is there a valid Sec. 12(2) claim against Integrated based on the "zestily rebound" statement. Integrated was neither the author nor the sender of the May 7 Letter in which the statement was made, and no evidence was proffered that OFS, which did not enter into an agreement with Integrated until three months thereafter, was acting as Integrated's agent or coconspirator in making the statement. There is no evidence that Integrated was aware of the May 7 Letter. Certainly, all of Integrated's statements expressly disclaimed any prediction as to the eventual market price of the Integrated shares. Accordingly, Integrated cannot be said to have made or to have had reason to know of the misrepresentation.
 
 D. Dismissal of the State Claims
 
 72
 Finally, we reject Mayer's argument that the district court was required to rule on her pendent state law claims. "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The decision whether to exercise pendent jurisdiction "lies uniquely in the discretion of the district court," Falls Riverway Realty, Inc. v. City of Niagara Falls, 732 F.2d 38, 42 (2d Cir.1984), and we will not reverse a district court's decision to decline pendent jurisdiction absent an abuse of discretion, see Rogers v. Valentine, 426 F.2d 1361, 1363 (2d Cir.1970), especially when the federal claims in a case are dismissed before trial, see Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139; McLearn v. Cowen & Co., 660 F.2d 845, 850 (2d Cir.1981) (Lasker, J., concurring); Kavit v. A.L. Stamm & Co., 491 F.2d 1176, 1180 & n. 4 (2d Cir.1974).
 
 
 73
 We find no abuse of discretion here. Pretrial preparation has apparently been devoted almost exclusively to the federal disclosure and fraud claims. The content and extent of fiduciary duties are fundamental issues of state law, see Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 478-79, 97 S.Ct. 1292, 1303-04, 51 L.Ed.2d 480 (1977), and we decline to reverse a district court for refusing to use pendent jurisdiction to reach out for such issues, thereby depriving state courts of opportunities to develop and apply state law in this area, when, as here, a plaintiff's federal claims are without sufficient merit to require a trial.
 
 
 74
 We note that New York law allows Mayer to refile her state law fiduciary duty claim in a state court within six months of this decision, see N.Y.C.P.L.R. Sec. 205 (McKinney's Supp.1986), and to the extent that the discovery conducted in the present suit has a bearing on the state issues, it would likely reduce the parties' discovery needs in the state court action.
 
 CONCLUSION
 
 75
 We have considered all of Mayer's contentions on appeal and have found them to be without merit. The judgment of the district court is affirmed.
 
 OAKES, Circuit Judge (concurring):
 
 76
 I concur in Judge Kearse's opinion subject only to these additional comments in reference to the dismissal of the state claims. I agree, on balance, that dismissal here was proper in light of the factors which Falls Riverway Realty, Inc. v. City of Niagara Falls, 732 F.2d 38 (2d Cir.1984), sets forth. Those favoring dismissal are:
 
 
 77
 judicial economy, fairness to the parties, the delicacy of the state law issues, the policy of having federal courts avoid "needless decisions of state law[, "] United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139....
 
 
 78
 Id. at 42.
 
 
 79
 We should, however, not lose sight of the factors opposed to dismissal mentioned in Falls Riverway:
 
 
 80
 the likelihood of a prompt disposition in this long-delayed litigation and the legitimate interests and expectations of the parties in having a trial in federal court. See Kavit v. A.L. Stamm & Co., 491 F.2d 1176, 1179-80 (2d Cir.1974).
 
 
 81
 Id.
 
 
 82
 They simply are not here sufficiently involved to warrant calling the dismissal an abuse of discretion.