792 F.2d 614
 Fed. Sec. L. Rep. P 92,764
Charles KADEMIAN and Stan Janes, et al., Plaintiffs-Appellants,
v.
LADISH CO., a Wisconsin corporation, et al., Defendants-Appellees.
Stan JANES, et al., Plaintiffs-Appellants,
v.
LADISH CO., a Wisconsin corporation, et al., Defendants-Appellees.
William DIXON, Jane Schennum and Robert Eisele, Plaintiffs-Appellants,
v.
LADISH CO., a Wisconsin corporation, et al., Defendants-Appellees.
 Nos. 84-2758, 85-1280 and 85-1300.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 5, 1985.
Decided May 28, 1986.
 
 Eugene J. Frett, Sperling, Slater & Spitz, David A. Genelly, Fishman, Merrick & Perlman, Chicago, Ill., for plaintiffs-appellants.
 Richard C. Ninneman, Whyte & Hirschboeck, Milwaukee, Wis., for defendants-appellees.
 Before CUDAHY and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 Ladish Company was a closely-held corporation until October 1981, when it became a wholly-owned subsidiary of Armco, Inc., through a corporate merger.[1] This merger resulted in a number of lawsuits, which are consolidated here. William Dixon, Jane Schennum and Robert Eisele represent a class of Ladish shareholders (the "class plaintiffs") whose Ladish shares were converted to shares of Armco as a result of the merger. Charles Kademian, Stan Janes, Michael Deutsch, Herbert Ende and J.M. Browning are all former vice-presidents of Ladish (the "vice-president plaintiffs") who sold the bulk of their Ladish shares to ACF Industries immediately prior to the merger. Both sets of plaintiffs sued Ladish; Armco; Victor Braun, former President and Chairman of the Board of Ladish; the Board of Directors of Ladish; the Victor F. Braun Foundation and the Herman W. Ladish Family Foundation, two tax-exempt foundations with substantial Ladish holdings; and certain other Ladish shareholders, asserting claims under the federal securities laws and Wisconsin corporation law. The district judge entered summary judgment for the defendants on the federal claims and dismissed the state claims for failure to state a claim. We affirm as to the federal claims, reverse as to the state claims and remand for further proceedings.
 
 I. FACTS
 
 2
 Like the district court, we will accept as true the facts as presented by the plaintiffs.[2] The district court recounted the plaintiffs' version of events as follows:
 
 
 3
 The plaintiffs describe the financial history of the Ladish Company as a conspiracy to maintain rigid control over the value of the company and to make it appear to be much lower than it actually was. Victor Braun was Chairman of the Ladish Board. Its chief officer was John Ladish. Their primary goal, in the plaintiffs' view, was to block any free market activity in Ladish securities, "to keep the reported value and trading prices of the Ladish Co. stock as low as possible." (Complaint, p 31.) The underlying purposes in doing so were two-fold: First, since much of the Ladish stock was held by charitable foundations which were run by Braun and Ladish, Braun and Ladish could maintain control of the company only if these foundations could avoid disposing of their stockholdings pursuant to IRS requirements for tax exempt foundations. By keeping the price of the stock low, the charitable foundations were able to maintain substantial holdings of Ladish stock, and Braun and Ladish were able to maintain control of the company. Second, keeping the stock price low enabled Braun, who had reached the age of 85 and who owned a substantial amount of Ladish stock, to pass on an estate whose value for tax purposes was significantly less than "its true worth" (Complaint, p 31d).
 
 
 4
 In pursuit of these goals, the plaintiffs allege that Braun intervened in and controlled transactions of the stock by arranging sales at preset prices and by regulating the number of buyers and sellers in the market. (Complaint, p 33a.) Braun also allegedly took steps to discourage transactions at the corporate level by restricting access to the company's financial information and by concealing or quashing bids for the company's control.
 
 
 5
 All of this alleged control over the market for Ladish shares began to come to an end when certain Ladish vice-presidents sought out a merger partner for Ladish. They hoped to earn a rate of return better than what Braun made available, a deal which might reflect what they believed to be Ladish's true worth. However, they were unable to escape the force of Braun's control. For example, some officers approached Armco, who had long been a supplier and purchaser for Ladish, and who had allegedly coveted Ladish for years (Br. in Opposition at 15). However, Armco was concerned about offending Braun and losing Braun's cooperation in securing control of Ladish at some later date. Thus, according to the plaintiffs, Armco refused to purchase any shares without Braun's approval.
 
 
 6
 In late 1980, Ladish Vice-President Charles Kademian turned the attention of these maverick officers to ACF Industries, a Ladish customer which had expressed interest in pursuing a merger. Braun, however, attempted to dissuade ACF. He misrepresented the term of ACF's proposal to the Ladish Board, he informed the ACF Chairman that any purchase of Ladish stock would be considered an unfriendly act, and he attempted to dissuade the mavericks from seeking offers for their stock.
 
 
 7
 However, ACF was undeterred. On June 13, 1981, it agreed to purchase stock from a group of vice-presidents. It acquired approximately 5% of outstanding Ladish stock at a cost of up to $2,000 per share--nearly 20 times the price which Braun had "predetermined" for sales of Ladish stock.
 
 
 8
 Through these purchases, ACF obtained a portion of shares sufficient under Wisconsin law to demand access to Ladish financial records. It was at this point, according to the plaintiffs, that Braun gave up hopes of controlling the company and began to pursue merger negotiations with Armco "regardless of the cost to Ladish shareholders" (Br. in Opposition at 17).
 
 
 9
 And so, according to the plaintiffs, a race to settle the merger ensued. It was in Braun's interests to declare a quick merger with Armco, the plaintiffs believe, in order to short-circuit a complete unraveling of the details of his prior stock manipulations and still maintain control over Ladish. It was in Armco's interests to settle the merger as quickly as possible in order to preempt a bidding war with ACF.
 
 
 10
 Within a week after ACF's 5% purchase, Braun contacted Armco representatives. He met with them several times immediately after. At these meetings, Braun negotiated with Armco on the basis of studies prepared for him by the Ladish treasurer. These studies indicated that the company's true per share value was much higher than the $2,000 offer which ACF had proposed as its purchase price. Among the valuations which Braun defended were $3,468 per share, $3,738 per share, and $4,074 per share. Braun once calculated that when the company's "good will" was factored into valuations, the true worth of Ladish was $700 million--in excess of $6,000 per share. However, the deal settled much closer to the ACF offer. Armco proposed to exchange 60 Armco shares for 1 Ladish share, a value to Ladish shareholders of $2,100 per share. Armco's Chairman William Verity admitted at his deposition that the $2,000 mark was the "hurdle" Armco had to surpass.
 
 
 11
 Next the merging companies swiftly turned their attention to locking up their deal. According to the plaintiffs, this was necessary in order to head off a bidding war prompted by ACF. The Braun family, John Ladish and the two foundations together controlled nearly a majority of the outstanding shares of Ladish stock. Purchase agreements were executed with these and other shareholders on July 2, 1981. They consisted of conditional promises by Armco to purchase Ladish shares. Armco would buy the Ladish shares owned by those who signed the agreements if the merger failed to go through, but only on the condition that none of the contracted group commit itself to "vote any of the shares in favor of any merger or in favor of any sale of all or substantially all of the assets of the company with or to any company other than Armco" (Br. in Opposition, App.Ex. 11). Thus, regardless of the wishes of other directors or shareholders, Armco would have control of Ladish through this fait accompli.
 
 
 12
 Nevertheless, ACF continued to fight for control of the company. On July 15, 1981, ACF wrote the Ladish Board proposing a merger at $2,500 per Ladish share. At later points in time, ACF offered $3,000 and ultimately $3,200 per Ladish share. Armco made no effort to improve its offer in response, other than to increase the exchange ratio from 60 to 66 shares per Ladish share in order to account for the amount of value Armco stock lost while the deal was pending.
 
 
 13
 The Ladish Board approved the merger agreement on July 19, 1981. Ladish and Armco jointly issued a Proxy Statement on September 16, 1981, in anticipation of a shareholders meeting to be held on October 9, 1981. According to the plaintiffs, the defendants "carefully wove a tale of deception" into the Proxy. The plaintiffs claim that the Proxy Statement omits or misrepresents facts about Ladish finances, the corresponding value of its stock, Braun's manipulation of the stock, and the background of the merger negotiations.
 
 
 14
 Dixon v. Ladish Co., 597 F.Supp. 20, 24-25 (E.D.Wis.1984).
 
 
 15
 On October 5, 1981, four days before the special shareholders' meeting, plaintiffs Dixon and Schennum filed a non-class complaint in federal district court for the Northern District of Illinois, seeking to enjoin the merger on the ground that if it went through they would suffer "loss and damage in that they will receive a grossly inadequate consideration for their shares of Ladish Co. stock." Original Complaint, p 61. In the alternative, they sought damages in the event the merger went through. They moved the district court for a temporary restraining order and at an adversary hearing two days later the trial court issued an order that permitted the Ladish shareholders to vote but restrained the defendants from taking any final steps to consummate the merger. The shareholders voted on October 9 and 92% of the shares were voted in favor of the merger; the only negative votes were cast by ACF, Dixon, Schennum, and shareholders Steinbrecher and Sutton.
 
 
 16
 This court vacated the district court's order, finding that the district court had erred in entering a preliminary injunction[3] when plaintiffs had not shown a reasonable likelihood of success on the merits. This court further noted:
 
 
 17
 in regard to likelihood of success on the merits ... our recent decision in Panter v. Marshall Field & Co., 646 F.2d 271 (7th Cir.1981), places very substantial obstacles in the way of plaintiffs' claims under the federal securities law which are based, as the claims in the instant case appear to be in this procedural context, on breaches of state law fiduciary duties and the failure to disclose such breaches under the securities laws.
 
 
 18
 Dixon v. Ladish Co., 672 F.2d 920 (7th Cir.1981), at 5 (unpublished order).
 
 
 19
 The merger was successfully completed on October 16, 1981 and on the motion of defendants Armco and Ladish the case was transferred to the Eastern District of Wisconsin. Plaintiffs were granted leave to file an amended complaint, which took the form of a class action on behalf of "all persons who were shareholders of Ladish Co. on September 4, 1981 [the record date for voting on the merger] or on October 16, 1981 except persons named as defendants in this action." Amended Complaint, p 23. The theory of the amended complaint was that the defendants had schemed to depress the price of Ladish stock and had caused Ladish shareholders "to approve the merger acquisition of Ladish Co. by Armco at a grossly inadequate consideration." Amended Complaint, p 61. Count I alleged a violation of Secs. 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. Secs. 78j(b), 78n(e), and the rules promulgated thereunder. Count II alleged a violation of Secs. 11, 12(2), and 17(a) of the Securities Act of 1933, 15 U.S.C. Secs. 77k, 77l, 77q. Count III alleged a conspiracy among all defendants except Armco to violate Sec. 10(b) of the 1934 Act. Counts IV and V alleged violations of Wisconsin law regarding tortious interference with business expectancy and breach of fiduciary duty.
 
 
 20
 On June 14, 1982 the vice-president plaintiffs filed individual complaints asserting the same factual allegations and claiming that they incurred damages both when they sold the bulk of their Ladish holdings to ACF for a consideration influenced by the defendants' scheme to depress stock prices and when they received Armco shares for the balance of their Ladish shares at the time of the merger. These actions were consolidated with the class action for purposes of discovery and pre-trial motions.
 
 
 21
 Defendants then moved for dismissal or in the alternative for summary judgment as to all claims.[4] In a published decision and order the district court dismissed all federal securities claims. Relying on Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), and Panter, supra, it ruled that
 
 
 22
 the plaintiffs' federal claims fall short of satisfying the purpose of the securities acts. What appears to be a rather bitter bout between opposing managerial camps cannot perdure in federal court on the basis of the nondisclosures, misrepresentations and manipulations which the plaintiffs describe. Indeed, intervening on the basis of what transpired in this case would set a precedent for federalizing every merger.
 
 
 23
 Dixon, 597 F.Supp. at 29.
 
 
 24
 In a later order, the district court, in view of the absence of any remaining federal claim, dismissed the pendent state claims. Memorandum Decision and Order (July 9, 1984). Plaintiffs moved to have their state claims reinstated on the basis of diversity jurisdiction, Defendants' Motion to Reconsider (Aug. 2, 1984), and the district court reinstated the state claims of all plaintiffs except Kademian, for whom diversity was lacking. Decision and Order (Sept. 18, 1984), at 4. It then dismissed these claims on the ground that the Wisconsin appraisal rights statute, Wis.Stats.Ann. Sec. 180.72, provides the exclusive legal remedy available to the plaintiffs here. Decision and Order (Jan. 10, 1985). Final judgment was entered and the plaintiffs appealed.II. FEDERAL SECURITIES LAW CLAIMS
 
 
 25
 This appeal requires us to examine the role of the federal securities laws in policing corporate mergers effected under state law. Our starting point must be the Supreme Court's decision in Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1976), which involved the claim, brought under Sec. 10(b) of the 1934 Act and accompanying Rule 10b-5,[5] of a shareholder who had been "frozen out" by majority shareholders pursuant to a statutory short-form merger. The gist of the shareholder's complaint was that the cash-out price was too low and that the transaction thus operated as a fraud upon him under Rule 10b-5. The Court ruled that in order to state a 10b-5 claim a plaintiff must show "deception" or "manipulation" on the defendants' part within the meaning of the statutory scheme. Since the shareholder had been furnished with sufficient information to make an intelligent decision whether to accept the price offered or seek appraisal and since there was no "omission" or "misstatement" in the information provided, the transaction was not deceptive. Id. at 474, 97 S.Ct. at 1301. Nor was the transaction manipulative; manipulation, the Court explained, is " 'virtually a term of art when used in connection with securities markets,' " id. at 476, 97 S.Ct. at 1302, quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and is used in the technical sense "of artificially affecting market activity in order to mislead investors...." Santa Fe Industries, 430 U.S. at 477, 97 S.Ct. at 1302.
 
 
 26
 The Court concluded that "once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute." Id. at 478, 97 S.Ct. at 1303. Finally, the Court emphasized the limited scope of the federal securities laws: they address those injuries arising from transactional fraud, as opposed to the results of underlying corporate mismanagement. "Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." Id. at 479, 97 S.Ct. at 1304.[6]
 
 
 27
 Keeping in mind the limitations articulated in Santa Fe, we examine first the allegations, common to all plaintiffs here, that the defendants violated the securities laws by their activities and statements in connection with the merger. These include illegal deception in disseminating an untruthful or misleading proxy statement and manipulation of the market for Ladish stock through a "market freeze" and "lock-up" agreements entered into prior to the merger. We shall then examine the vice-president plaintiffs' additional allegations of illegal deception and manipulation in connection with their pre-merger sales of Ladish stock to ACF.
 
 
 28
 A. Deception: the Proxy Statement.
 
 
 29
 Plaintiffs appeal the district court's determination that the proxy statement issued in connection with the Armco-Ladish merger was not deceptive. They assert that the proxy either misstated or omitted certain information in violation of the securities laws. The trial court had found that these items were either actually disclosed, not required to be disclosed or immaterial. They fall into two general classes of information, that concerning events preceding the merger and that concerning Ladish's finances.
 
 
 30
 1. Events Preceding the Merger. Before the district court plaintiffs argued that the proxy statement should have disclosed the "market freeze" perpetrated by Braun and his self-interest in controlling Ladish prices and keeping them artificially low. The district court correctly noted that "[t]he defendants' failure to describe, in terms as dramatic as those chosen by the plaintiffs, Braun and Ladish's interests in protecting the charitable foundations which they managed and in their control over the company does not state a claim under the securities laws." 597 F.Supp. at 29. Without more, such an omission is simply a failure to reveal a breach of fiduciary duty, and this court has already held, in Panter v. Marshall Field & Co., 646 F.2d 271 (7th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), that a plaintiff may not "bootstrap" a state law claim into a federal case "by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction." Id. at 288. Accord Atchley v. Qonaar, 704 F.2d 355, 358 (7th Cir.1983); Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978); Golub v. PPD Corp., 576 F.2d 759, 765 (8th Cir.1978); Issen v. GSC Enterprises, Inc., 508 F.Supp. 1278, 1290 (N.D.Ill.1981); Hundahl v. United Benefit Life Insurance Co., 465 F.Supp. 1349, 1365-66 (N.D.Tex.1979); Bucher v. Shumway, [1979-1980 Transfer Binder] Fed.Sec.L.Rptr. (CCH) p 97,142 at 96,301 (S.D.N.Y.1979), aff'd without opinion, 622 F.2d 572 (2d Cir.), cert. denied, 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980).
 
 
 31
 Rather, we explained in Panter, the critical issue is "whether the conduct complained of includes the omission or misrepresentation of a material fact." 646 F.2d at 288; see also, e.g., Data Probe Acquisition Corp. v. Datatab, Inc., 722 F.2d 1, 5 (2d Cir.1983), cert. denied, 465 U.S. 1052 (1984), (examining only "objective factual material"). Heeding this, plaintiffs have stressed on appeal those factors in the history of this merger that they assert would have "significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). See Appellant's Brief at 32 ("[T]he allegations of deception in this case, although most certainly perpetrated within the larger context [of] Victor Braun's fiduciary breach, also state sufficient claims of material omission and half-truth misrepresentation...."). They argue that the following information would have affected their decision-making process when confronted with the vote on the merger: (1) Braun's premerger manipulation of Ladish stock, which kept the price at about $125 a share; (2) the true reason for merging with Armco, which was to allow Braun to cover up his previous fiduciary breaches; and (3) the fact that ACF approached Ladish with a merger offer before Armco came on the scene.
 
 
 32
 We do not find this statement of the proxy's deficiencies any more persuasive. The plaintiffs' insistence on their ignorance that Ladish stock was highly undervalued is disingenuous in view of the $2,000 bid from Armco and subsequent ACF bids of $2500, $3000, and $3500 per share recorded in the proxy. As the district court noted, "once ACF came on the scene, the market was blown wide open." 597 F.Supp. at 31. Further, the proxy recorded internal valuation studies, commissioned by Braun, which alluded to even higher per share valuations. Materiality of an omission depends on whether there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." TSC Industries, 426 U.S. at 449, 96 S.Ct. at 2132 (emphasis added). This is an objective standard but one that requires an examination of the "total mix" of information available to the shareholders in a given case. Michaels v. Michaels, 767 F.2d 1185, 1196 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986). Given the numbers that were disclosed in the proxy there is not a "substantial likelihood" that the fact that the $125 price was artificially low would have been news to the Ladish shareholders.[7]
 
 
 33
 Plaintiffs also contend that defendants unlawfully failed to disclose the true reason for merging with Armco, which allegedly was to "allow Victor Braun to avoid exposure of the previous manipulation designed to minimize Ladish's worth by which he had maintained control of the company." Appellant's Brief at 50. The proxy statement lists six reasons why the Board of Directors favored the Armco merger over ACF's proposal: (1) the greater liquidity and price stability of Armco shares in the market; (2) Armco's lower debt-equity ratio; (3) Armco's greater business compatibility with Ladish; (4) Ladish's historic management relationship with Armco; (5) ACF's relative inferiority in modern steel manufacturing; and (6) the low likelihood of an ACF/Ladish merger being consummated in view of the 52.6% of Ladish shares that Armco had already locked up. Proxy at 14-15. This recitation of reasons to prefer a merger with Armco is, according to plaintiffs, what distinguishes their case from Panter and other cases in which courts have found no duty to disclose "impure motives." Panter, 646 F.2d at 288 (failure to disclose management policy of maintaining control at all costs); see also, e.g., Data Probe, 722 F.2d at 5 (failure to disclose that favored tender offer contained employment guarantees for management); Rodman v. Grant Foundation, 608 F.2d 64, 71 (2d Cir.1979) (failure to disclose that stock buy-back was motivated by desire to maintain control).
 
 
 34
 Plaintiffs argue that Panter stands for the proposition that "Defendants need not have made any statement at all about this egregious conduct if they had remained totally silent on the subject...." Appellant's Brief at 50 (emphasis in original). This distinction finds no support in Panter or the other cases. In Panter, shareholders brought a class action against Marshall Field & Company alleging securities law violations in connection with a tender offer that was opposed by Field's management and subsequently withdrawn. In response to the tender offer, Field's issued several press releases explaining its opposition to the merger. In these communications it explained that continued independence was in the best interests of the shareholders and the company in view of Field's "momentum" and "growth plans." 646 F.2d at 280. In holding that Field's did not violate the securities laws by failing to disclose that it actually objected to the merger because of a management policy of "independence at all costs," the court was not concerned that Field's had made a statement that, if the plaintiffs were correct, was misleading since it was not the true reason management opposed the tender offer. See also, e.g., Biesenbach, 588 F.2d at 402 (stating that transaction was in shareholders' interest when allegedly it was not states no federal claim); see generally Ferrara, et al., Disclosure of Information Bearing on Management Integrity and Competency, 76 Nw.U.L.Rev. 555, 576-80 (1981) (reviewing cases in which "[m]anagement ... has no obligation under the federal securities laws to disclose its 'true purpose' or 'motivation.' ").
 
 
 35
 Here the proxy statement contained a list of reasons why the company supported the merger. If plaintiffs are correct, they are misleading because they are not the true reasons the majority wants the merger. The only factual distinction is that Ladish was a bit more detailed in its proffered reasons than was Field's. But, especially as there has been no allegation that the factual matter involved is false (e.g., the assertions about relative debt/equity ratios and steel-making capacity),[8] we can think of no reason to distinguish these two cases or create an exception to the Panter rule.
 
 
 36
 Lastly, plaintiffs allege that the proxy statement's version of pre-merger events was misleading because it cast the impression that ACF was a last-minute "interloper" rather than a serious suitor. This, it is alleged, had the effect of covering up Braun's true motivations for pushing through the Armco merger: "Since ACF's actions forced Braun to seek out Armco to cover up his previous price manipulations, this information warned shareholders that the prior values for Ladish stock reflected artificially depressed prices. This in turn signalled that Armco's offer might not actually reflect the company's worth." Appellant's Brief at 48-49. We agree with the trial court that this information was not material in that it did not change the "total mix" of information available to the Ladish shareholders. As we have already noted, the shareholders were adequately apprised that $125 was not the market value of their shares in the context of a merger. Although we have held that merger negotiations and other indications of a "going" price are more important in the case of closely-held corporations, where there is no public market for the company's stock, Michaels, 767 F.2d at 1196 (preliminary merger negotiations material in small family corporation), here any information about price that a more detailed description of the merger's background might have provided was already disclosed. Despite any alleged Ladish machinations, a small bidding contest had broken out. All the history of the merger negotiations might have added was further evidence of a state law infraction.
 
 
 37
 2. Ladish Finances. Plaintiffs make several arguments about disclosure in the proxy statement addressed to the state of Ladish's finances. As noted above, the proxy statement contained the results of two internal valuation studies conducted by Ladish shortly before the merger. The proxy described the studies and their results as follows:
 
 
 38
 These two documents had been prepared in late June 1981 for possible use in any negotiation involving the acquisition of Ladish. Each of these documents contains a list of items such as net worth of Ladish, market value of Oremet stock, the LIFO reserve, etc., which when added together produced "adjusted book values" of Ladish Common Shares of $3,738 and $3,468 per share. These figures were developed by Ladish for use as negotiating tools and not with a view to dissemination to the public. While these figures were not, in the opinion of Ladish management, intended to reflect the value of Ladish Common Shares, but rather to comprise a list of considerations for use in negotiating exchange values, they are included in this Proxy Statement because of their possible interest to shareholders in considering their vote on the Merger.
 
 
 39
 Proxy at 13. Plaintiffs find this passage deceptive for two reasons. First, they argue that had Ladish disclosed the basis for the two calculations given, such information "might well have added legitimacy to the barebone figures which the proxy statement characterized only as a 'negotiating figure.' " Appellant's Brief at 38. Second, they claim that this passage is misleading for its failure to disclose a third internal valuation study, which put Ladish's per share value at approximately $4,074, as well as Braun's oral assessment to Armco Chairman Verity that, with good will factored in, Ladish was worth $700,000,000--or over $6,000 per share.
 
 
 40
 Plaintiffs do not appear to dispute the general proposition that there is no duty to disclose internal valuations under the federal securities laws. See, e.g., Panter, 646 F.2d at 293 ("[B]ecause the projections of the five-year plan were tentative estimates prepared for the enlightenment of management with no expectation that they be made public, there was no duty to reveal them."). Nor, apparently do they dispute that these were indeed purely internal valuations computed for use in negotiation. Rather they argue that since Ladish disclosed the $3,738 and $3,468 figures, it consequently was bound to disclose the third study and Braun's statement to Verity.
 
 
 41
 Aside from the fact that these latter two valuations are as suspect of being speculative as the first two,[9] their omission is not material. Plaintiffs assert that this information would have told them that Ladish management valued the company at a figure higher than $3,000. Shareholders were told that Ladish management favored an exchange with Armco worth $2,100 per share, although another eager suitor was willing to pay substantially more. A reasonable shareholder could either conclude that the internal figures were inflated and that there was a valid business reason for favoring the Armco merger, or it could conclude that something shady was going on. Since the Armco deal was struck at a figure $1,000 lower than any of the internal studies, it is difficult to see how knowledge of two more speculative figures would change the "total mix" of information available.
 
 
 42
 Finally, shareholders point to a number of techniques employed by Ladish in preparing (with Arthur Andersen, an independent accountant) the financial statement appended to the proxy; they assert that these techniques had the effect of vastly understating Ladish's net worth. Their first example is Ladish's use of last-in, first out (LIFO) to account for the bulk of their inventory. Had they used first-in, first-out (FIFO), reported earnings would have been higher. As the district court noted, the proxy disclosed that "[h]ad the FIFO method of inventory valuation been used exclusively inventories would have been $134,516,000, $94,590,000 and $61,637,000 higher than reported at December 31, 1980, 1979 and 1978." Proxy at 48. There is no duty, as plaintiffs suggest, to rework the figures with alternative accounting methods.
 
 
 43
 Plaintiffs also argue that the proxy put the book value of plant and equipment at cost rather than market value and used accelerated depreciation techniques to retire some equipment so that it was not valued in the financials. They assert that Ladish expensed rather than capitalized certain durable assets, shortened the periods over which the cost of unfunded employee benefits were amortized and chose an unrealistically low rate of return on unfunded employee pension liabilities. Ladish does not deny that it did these things; all are accepted accounting techniques and each is disclosed in the footnotes to the financial statement. What Ladish did not disclose, argue plaintiffs, is that each of these methods understated the company's "true worth." This was not necessary. Rule 10b-5 imposes a duty to disclose, "not a duty to become enmeshed in labelling disclosed information." Hundahl, 465 F.Supp. at 1364. In Hundahl, plaintiffs alleged that "Mutual failed to disclose the degree to which United's 'very conservative' book value conversions understated United's worth and earnings." Id. The court noted that such an allegation "seek[s] a disclosure of management's motive; plaintiffs' allegation ... would require management to label its decisions." Id. at 1365. We agree. Requiring a company to append a disclaimer, explaining why it chose each accounting practice and reciting the effects of all alternative methods, is tantamount to mandating a confession of motive. This, as we have already noted, the securities laws do not require.
 
 
 44
 Plaintiffs' heavy reliance on this court's decision in Atchley v. Qonaar Corp., 704 F.2d 355 (7th Cir.1983), is misplaced. In that case, it was alleged that defendants embarked upon a scheme to depress the earnings of Qonaar so that they could acquire its stock at an artificially low price. The court found a securities law violation on the ground that the defendants had misrepresented facts about Qonaar's financial health. The eight actions that the defendants were alleged to have taken either reduced the firm's actual revenues (e.g., negotiating large contracts so that payment would come due after the tender offer and making substantial charitable donations which departed from prior practice) or were false accounting practices (e.g., taking false write-offs and falsely designating certain debts bad). The statements in Atchley were deceptive because false numbers were plugged into the accounting process. Defendants were actively engaged in depressing the firm's outlook for the purpose of the tender offer. Further, Qonaar was a publicly-held corporation, traded over the counter. The alleged activities of defendants depressed Qonaar's market price, the most reliable indicator of the firm's value. In terms of both deception and materiality, this is a different case. Here there is no allegation that the company's finances were being fraudulently manipulated but rather that conservative accounting was used without disclosing the motive for using it.[10] Also, there was an indication of market value in the prices being bid for control, and these numbers were disclosed.B. Manipulative Conduct.
 
 
 45
 Plaintiffs also claim that the district court erred in ruling that they did not show illegal "manipulation" of the market in Ladish stock when (1) Braun allegedly controlled the market for Ladish stock (the "market freeze") and (2) Armco entered into "lock-up" agreements with the majority shareholders of Ladish. First, they argue that 10b-5 manipulation does not require an allegation of deception, relying on Mobil Corp. v. Marathon Oil Co., 669 F.2d 366 (6th Cir.1981), a case in which a fully disclosed "lock-up" (the grant of an option to sell the target's "crown jewel" asset to one suitor) was found actionable under section 14(e) of the Williams Act. That court's rationale was that the option "artificially and significantly discouraged competitive bidding for the Marathon stock," id. at 376, even though the arrangement was fully disclosed. But see Feldbaum v. Avon Products, Inc., 741 F.2d 234 (8th Cir.1984); Data Probe, supra; Buffalo Forge Co. v. Ogden Corp., 717 F.2d 757 (2d Cir.), cert. denied, 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983).
 
 
 46
 The Mobil rationale was recently rejected by the Supreme Court. In Schreiber v. Burlington Northern, Inc., --- U.S. ----, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985), the Court held that a claim of manipulation under section 14(e) requires a showing of deception: "The use of the term 'manipulative' provides emphasis and guidance to those who must determine which types of acts are reached by the statute; it does not suggest a deviation from the section's facial and primary concern with disclosure...." Id. at 2462. Applying this rationale to Rule 10b-5, we find that the district court did not err in holding that plaintiffs had stated no claim of unlawful manipulation. The lock-up agreements were fully disclosed in the proxy. As we concluded above, the effects of any "market freeze" perpetrated by Braun were also adequately disclosed in the proxy.
 
 
 47
 Plaintiffs also contend that the trial judge erred in viewing the market freeze and the lock-up as two separate schemes of manipulation. They view these two events as a "unified scheme" by which the merger was consummated (for all practical purposes, since a vote against it would not change the outcome) before any disclosure was made that would have suggested that the reported price of Ladish stock was grossly inaccurate. If the plaintiffs' allegations are true, there may well be a violation of state corporation law, but it does not follow from that fact that a federal securities violation occurred. Plaintiffs seek to satisfy the "deception" element of a 10b-5 action with the market freeze. But failure to disclose the market freeze was not actionable deception, and combining it with the fully disclosed lock-up cannot "bootstrap" it into a securities violation.
 
 
 48
 C. The Vice-Presidents' Claims.
 
 
 49
 The vice-president plaintiffs have raised additional federal claims distinct from those concerning the merger. They argue that Braun and Ladish violated Sec. 10(b) and Rule 10b-5 by historically misrepresenting Ladish's "true" value and by manipulating the market for Ladish stock so that it sold at artificially low prices. These practices, they allege, deceived them and resulted in their bargaining "in the dark" when they sold stock to ACF. Since it was these sales that precipitated the merger, neither the proxy statement nor the limited bidding for control enlightened them as to Ladish's per share value.
 
 
 50
 Deception, as alleged in a 10b-5 claim, must, however, cause the loss incurred and in a situation like this, causation and reliance are closely related, see, e.g., Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1172 (2d Cir.1970) (test of reliance is properly one of tort causation). These related concepts defeat the vice-presidents' claim. They admit that they sold their stock because they did not believe what they had been told about the value of Ladish stock. See Janes Complaint at p 32 (vice-presidents "approached representatives of ACF Industries and others and expressed their concern and belief that their shares of Ladish Co. were substantially undervalued"); Appellants' Brief at 12 ("[E]ach understood generally that the worth of their stock holdings must have been substantially greater than what Braun consistently reported."). Neither the financial reports nor the alleged market freeze "caused" the securities transaction in which the vice-presidents sold their stock. What caused the vice-presidents to sell, according to their theory of the case, was their frustration at being trapped as minority shareholders in a corporation whose majority was systematically undervaluing its holdings.[11]
 
 
 51
 The vice-presidents also apparently wish us to view this as a case of omission to give correct financial statements: they were bargaining "in the dark" because they "could furnish ACF only the understated financials, not more accurate information which showed Ladish worth as much as $4,074 a share and perhaps $6,000 a share." Appellant's Brief at 53. Although privity is not necessary to raise a duty to disclose, see Shapiro v. Merrill, Lynch, Pierce, Fenner & Smith, 495 F.2d 228, 236-37 (2d Cir.1974), the defendant must at least be buying or selling securities (or involved in a scheme to buy or sell securities[12] ) for a duty to disclose to arise. Gert v. Elgin National Industries, Inc., 773 F.2d 154, 158-59 (7th Cir.1985). Braun may have had a state law fiduciary duty to keep the vice-presidents apprised of the stock's value, but this does not, without more, translate into a federal law duty to disclose. See Santa Fe Industries, supra.
 
 III. STATE LAW CLAIMS
 
 52
 Although we hold that the plaintiffs state no claims under the federal securities laws, we believe that they should be given the opportunity to present their state law claims to the district court. Santa Fe Industries does not hold that injuries of the type plaintiff has alleged are not actionable, rather only that they are not violations of the federal securities laws. The plaintiffs' allegations state claims for breach of fiduciary duty under state corporation law. The district court dismissed these claims on the theory that the Wisconsin appraisal statute affords the exclusive remedy available to dissenting shareholders. We disagree.[13]
 
 
 53
 Like most states, Wisconsin provides a statutory procedure by which minority shareholders can compel the corporation to buy them out at an appraised value in the event of a fundamental corporate transaction.[14] This appraisal remedy has been described as "the quid pro quo for statutes giving the majority the right to override the veto which previously the holder of even one share could exercise against mergers, sales of all assets, and other basic corporate changes." Vorenberg, Exclusiveness of the Dissenting Shareholder's Appraisal Rights, 77 Harv.L.Rev. 1189, 1194 (1964) (footnote omitted). The majority is free to make fundamental changes in the corporation despite the minority's disapproval, but appraisal prevents it from depriving the minority of the fair value of its investment. Most states' appraisal statutes, however, are unclear about the range of circumstances in which appraisal replaces the shareholder's right to sue for damages or equitable relief. See generally id. at 1207 (citing statutes and cases). The Wisconsin statute does not explicitly state what actions are barred by the existence of an appraisal remedy.[15]
 
 
 54
 The Wisconsin appraisal statute was enacted in its present form[16] in 1971, when the legislature combined two earlier appraisal statutes, Sec. 180.69 (appraisal in the event of a merger or consolidation) and Sec. 180.72 (appraisal in the event of a sale, lease or exchange of assets), both of which stated that appraisal "shall be exclusive of any other remedy or relief, except that [it] ... shall not be construed to bar any remedy of a shareholder upon a cause of action founded upon fraud or illegality in connection with" the proposed corporate action. L.1965, ch. 53; see Wis.Stats. Secs. 180.69 (3m), 180.72(4m) (1965). This new appraisal statute was basically the same as that in the Model Business Corporations Act. See Model Bus.Corp.Act Ann.2d Sec. 81; Comment, L.1971, ch. 285 ("This new Sec. 180.72 ... with minor editing adopts the model act provisions....").
 
 
 55
 In view of this sparse legislative history and the fact that the Wisconsin courts have not yet construed Sec. 180.72, the district court relied on the Comment to the appraisal provision in the Model Business Corporations Act:
 
 
 56
 Section 81 provides for one forum where all claims for appraisal may be consolidated regardless of claimants' places of residence, thus eliminating a multiplicity of actions in various courts which is harmful to corporation and shareholders alike.
 
 
 57
 A few jurisdictions permit the shareholder to have his stock appraised or to sue to set aside the transaction objected to, but ordinarily he may not do both. Some jurisdictions expressly provide that the appraisal remedy shall be exclusive. The provisions of the first paragraph of section 81 shall have the same result.
 
 
 58
 Most decisions hold that the appraisal right is the exclusive remedy in the absence of fraud or bad faith and if the proceedings were in accordance with statutory requirements.
 
 
 59
 Model Bus.Corp.Act Ann.2d Sec. 81, p 2.
 
 
 60
 We do not think that the district court interpreted this passage correctly when it found it to mean that appraisal bars any suit by minority shareholders. Rather, we think that it expresses the view that, in the usual case, a shareholder is bound by a corporate action, with only a right to claim the fair value of his shares. Even if he believes the action to be unwise or unfair, appraisal protects him from pecuniary loss, and he should not be allowed to frustrate the majority's goal by second-guessing its business judgment. But the prospect that all shareholders will be paid off does not justify the corporation or its officers in acting unlawfully. The appraisal remedy cannot substitute for a suit for breach of fiduciary duty or other torts. This was recognized even in Yanow v. Teal Industries, Inc., 178 Conn. 263, 422 A.2d 311 (1979), one of the cases upon which both the district court and defendants rely. There the plaintiff's claims respecting the merger itself (i.e., that it had been effectuated without corporate purpose and with the intent to freeze him out) were held barred by the appraisal remedy, 422 A.2d at 320-21, but his claims of fiduciary breach antecedent to the merger were not, id. at 321. This, we believe, is the most reasonable approach and the one the Wisconsin courts would take. Thus we reverse the district court on this point and remand the state law claims of all plaintiffs except Charles Kademian. On remand, the district court will also want to consider whether the principles of judicial economy underlying the doctrine of pendent jurisdiction would suggest that the pendent state claims of vice-president Kademian be reinstated so that this entire suit could be litigated in one forum.
 
 
 61
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 *
 Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Armco has since sold Ladish to Owens Corning Fiberglas Corporation
 
 
 [2]
 The district court decided this case on defendants' motions to dismiss the complaint or in the alternative for summary judgment. Because the parties filed affidavits and other supporting documents, the district court treated the motions as motions for summary judgment
 At oral argument plaintiffs raised the objection that they had been afforded insufficient discovery before the district judge ruled against them. They only touched upon this point tangentially in their brief, see Appellants' Brief at 36 ("[s]ummary judgment is particularly inappropriate where discovery is substantially incomplete as in this case.").
 Plaintiffs rely on Alabama Farm Bureau Mutual Casualty Co., Inc. v. American Fidelity Life Insurance Co., 606 F.2d 602, 609 (5th Cir.1979), cert. denied, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980), where the court cautioned that summary judgment should not ordinarily be granted before discovery is completed. In that case, however, a shareholder's derivative Sec. 10-b action, the court also noted that "some facts were so well established that it is not conceivable that they would ever be disputed, and no countervailing evidence might be adduced regarding these points if further depositions or documents were permitted." Id. at 610. Examples of this sort of established evidence included the contents of the proxy statement and press releases.
 Likewise in this case, we do not think that further discovery could have adduced facts concerning appellants' federal claims of deception and manipulation that would give them a cause of action here. Cf. Gieringer v. Silverman, 731 F.2d 1272, 1276 (7th Cir.1984) (summary judgment may be inappropriate in those securities cases where "defendants' motive and intent cannot be determined prior to complete discovery" but where this is not the case "there is no such procedural impediment").
 Plaintiffs will presumably be allowed further discovery for their state claims, which do require an inquiry into motive, on remand.
 
 
 [3]
 We held that the district court's order was more properly viewed as a preliminary injunction (not a TRO) because (1) it issued following an adversary hearing and (2) it extended four days beyond the ten-day limit established for TRO's in F.R.Civ.P. 65(b). Dixon v. Ladish Co., 672 F.2d 920 (7th Cir.1981)
 
 
 [4]
 While the district court was considering these motions plaintiffs moved to again amend their complaint to assert a claim against all defendants save Ladish under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1961 et seq. The district court denied the motion to amend. Plaintiffs do not appeal this disposition of the proposed RICO amendment
 
 
 [5]
 Section 10 of the 1934 Act, 15 U.S.C. Sec. 78j, provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 Rule 10b-5, 17 CFR Sec. 240.10b-5, promulgated under the authority of Sec. 10(b), provides:
 Employment of Manipulative or Deceptive Practices.
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 
 
 [6]
 The district court relied on case law construing Sec. 10(b) of the 1934 Act, Rule 10b-5 and Sec. 14(e) of the Williams Act. This court has ruled that the Santa Fe analysis applies equally to Sec. 14(e). Panter, 646 F.2d at 282. The complaint also alleged violations of Secs. 11, 12(2) and 17(a) of the Securities Act of 1933, and the trial court applied the Santa Fe analysis to these alleged violations as well. Dixon v. Ladish Co., 597 F.Supp. at 28 (noting the "similarity of the purpose and operative language of the 1933 Securities Act"). Appellants have not challenged before this court the applicability of Santa Fe to these allegations. See Ernst & Ernst, 425 U.S. at 195, 96 S.Ct. at 1382 (1933 and 1934 Acts were motivated by philosophy of full and fair disclosure.)
 
 
 [7]
 Although we affirm the district's court decision that the defendants did not omit or misrepresent any material facts in violation of the securities law, we note here that the class plaintiffs would have had trouble on the issue of reliance. Materiality and reliance are conceptually related criteria, and the plaintiffs' injury is weakened by the fact that the named plaintiffs voted against the merger. Further, plaintiff Dixon stated in his deposition that the proxy did not deceive him. Dixon Deposition at 80-82. Cf. Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir.1985) ("If the investor already possesses information sufficient to call the representation into question, he cannot claim later that he relied upon or was deceived by the lie.")
 
 
 [8]
 Plaintiffs in Panter also argued that Field's issued misleading statements in regard to acquisitions it made after it was identified as a takeover target. Field's had announced that it was buying stores in Houston and the Pacific Northwest in accordance with "longstanding" expansion plans. Plaintiffs contended that the true purpose was to create an antitrust bar to a takeover. This court found that there was no federal duty to disclose the "true" motive, and added, "[f]urthermore, there is no evidence upon which a reasonable jury could base a finding that Field's misrepresented its acquisition plans." 646 F.2d at 291. That is, even if Field's was pursuing an "independence" policy by buying the stores, it was also true that Field's had been planning to expand
 
 
 [9]
 There is evidence that they were substantially more speculative. The $4,074 per share valuation was presented to Armco in June 1981 negotiations and immediately dismissed as inaccurate. An Armco inter-office memorandum states that there were two errors in that figure. The stock that Ladish held in Oregon Metallurgical Corp. (Oremet) was listed at a value above its current market value and a $42 million liability for vested, unfunded pension benefits was not recorded. "After reviewing the document with [Braun], we agreed that even under his method of valuation the correct value should be approximately $390 million ($3,594 per share)." Armco Confidential Interoffice Memorandum (June 25, 1981), at 2
 The $700 million valuation was made in a conversation between Braun and Armco Chairman Verity. According to Verity, Braun called him and said that he had thought of several things to add to Ladish's net worth. Chief among these was $200 million of good will. Verity Deposition, at 51-52. This undocumented claim to a $6,000 per share valuation is as attributable to sales "puffing" as anything else.
 
 
 [10]
 Appellants in their brief do contend that "reported income was reduced by deferring end of the year Ladish product deliveries to customers so as to reduce annual income." Appellant's Brief at 41. For that proposition, however, they cite us to the Backes deposition, where defendant Backes, a Ladish officer, testified that Ladish would only defer deliveries when a customer requested it. Backes Deposition, Vol. II, at 12-13
 
 
 [11]
 Their position as minority shareholders in a close corporation also would have made it difficult for the vice-president plaintiffs to clear the second hurdle of showing "loss causation," that is, that the misrepresentation affected the price they received and to what extent. See Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir.1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). The absence of a market for noncontrol shares makes valuation highly uncertain; transfer will be made difficult by high transactions costs. See Easterbrook & Fischel, Close Corporations and Agency Costs, 38 Stan.L.Rev. 271, 275 (1986). It is not at all obvious that the price the vice-presidents sold at ($1,000 plus a second $1,000 should ACF gain control) was low because of reported financials. Minority shares will never be valued as highly as control blocks. In any event, it would have been plaintiffs' task to show that $1,000 per share was a price that injured them
 
 
 [12]
 Those cases in which a defendant has had a federal duty to disclose information although he was neither the purchaser nor the seller have involved insider trading, see, e.g., Shapiro, 495 F.2d at 237 (non-dealing tipper must "disclose or abstain")
 
 
 [13]
 While we hold that the appraisal remedy is not so pervasive as to exclude suits alleging tortious conduct, we also note that the appraisal remedy could not bar the vice-presidents' separate claims in any case. The vice-presidents sold the bulk of their stock prior to the merger and thus statutory appraisal was unavailable to them
 
 
 [14]
 See Wis.Stats.Ann. Sec. 180.72(1) (West Supp.1985) (appraisal right for corporate merger or consolidation or a sale, lease or exchange of assets). A shareholder must dissent--file a written objection before a vote is taken on the proposed corporate action--and if the corporate action is then approved, the shareholder must within ten days make written demand upon the corporation for the fair value of his shares. Sec. 180.72(2). If the corporation and the shareholder cannot agree on the stock's fair value, either may file a petition requesting that the fair value be determined by the court. Sec. 180.72(3)
 
 
 [15]
 Compare the New Jersey statute, which expressly allows a suit in the event of fraud or illegality, N.J.Stat.Ann. Sec. 14A:11-5(2) ("[T]his subsection shall not exclude the right of such dissenting shareholder to bring or maintain an appropriate action to obtain relief on the ground that such corporate action will be or is ultra vires, unlawful or fraudulent as to such dissenting shareholder."), with the Connecticut statute, which explicitly states that the appraisal remedy is exclusive, Conn.Gen.Stat. Sec. 33-373(f) ("[S]uch remedy shall be [the dissenting shareholder's] exclusive remedy as holder of such shares against the corporate transactions described in this section, whether or not he proceeds [with an appraisal petition].")
 Defendants lay great weight upon the "plain language" of Sec. 180.72. They note that Sec. 180.72(6) states that the jurisdiction of the court hearing an appraisal proceeding shall be "exclusive." But this follows a provision that states that all parties who have made demand shall be joined in one proceeding. In this context, this sentence suggests rather that there shall be only one forum deciding what the fair value of one company's stock is. Defendants also note that the statute says that a shareholder failing to make demand shall be "bound by the terms of the proposed corporate action." But whether this phrase means merely that a shareholder cannot be heard to complain that the transaction was not fair to him or whether it means that he is also bound when the proposed corporate action is fraudulent is what we must decide here.
 
 
 [16]
 This section was amended in 1983 to conform to certain statutory changes, not relevant here, in the section dealing with statutory close corporations